Noemi **GARROVILLAS**, Petitioner,

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,**
Respondent.

Nos. 96–70473.

United States Court of Appeals,
Ninth Circuit.

Submitted Oct. 7, 1997.*

Decided Sept. 29, 1998.

* The panel unanimously finds this case suitable for decision without oral argument.  Fed. R.App. P. 34(a) and Ninth Circuit Rule 34–4.

Joseph Feldun, Steve J. Rodriguez and Kimberly R. Furman, Korenberg, Abramowitz & Feldun, Encino, CA, for petitioner.

Linda S. Wendtland and Gretchen M. Wolfinger, Office of Immigration Litigation, United States Department of Justice, Washington, DC, for respondent.

Before: REINHARDT and TASHIMA, Circuit Judges, and SHADUR, District Judge.**

REINHARDT, Circuit Judge:

Noemi Garrovillas petitions for review of the Board of Immigration Appeals' (BIA) denial of his application for political asylum, withholding of deportation, and voluntary departure. We grant the petition for review, vacate the BIA's decision, and remand for further proceedings.

## BACKGROUND

Garrovillas, a forty-three year old married male and a native and citizen of the Philippines, entered the United States on or about March 17, 1990. Thereafter, he remained in the United States beyond his authorized period of stay. In an Order to Show Cause, dated March 1, 1994 and amended on January 23, 1995, the Immigration and Naturalization Service (INS) charged him as an overstay under § 241(a)(1)(B) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1251(a)(1)(B).

At the outset of his deportation hearing, which began on June 24, 1994, Garrovillas contested his deportability and filed an application for political asylum, withholding of deportation, and voluntary departure, under §§ 208(a), 243(h)(1), and 244(e)(1) of the INA, 8 U.S.C. §§ 1158(a), 1253(H), and 1254(e)(1). Subsequently, when the evidentiary part of the hearing took place, on July 6, 1995, Garrovillas admitted the factual allegations contained in the amended Order to Show Cause and conceded deportability as charged.

In support of his application for relief, he testified to the following facts. Prior to his arrival in the United States, Garrovillas lived in the Rizal province of the Philippines. Between 1985 and 1988, he was active in the Civilian Home Defense Force (CHDF), a para-military organization which acted in conjunction with the Military Intelligence Unit of the Armed Forces of the Philippines.

During his service in the CHDF, Garrovillas gathered information about and infiltrated the ranks of the New People's Army (NPA), a communist insurgency that operated in the countryside. Garrovillas pretended to be one of the NPAs while, in fact, acting on behalf of the CHDF. On four separate occasions between 1986 and 1988, he discovered and visited the newest NPA military training camp locations in Tanay, Rizal and then notified his CHDF contact of these locations.

In early 1989, members of the NPA became suspicious of Garrovillas's anti-communist beliefs and his activities over the preceding three years. In January of 1989, he received a letter at his home which caused him to believe that the NPA had found out that he was a supporter of the government. The letter contained a black ribbon, which Garrovillas understood to be the NPA's symbol for a death threat. Many people in Rizal who had received similar letters containing black ribbons had subsequently been killed by the NPA.

During the next three months, Garrovillas received two more letters at his home with black ribbons attached. The last letter he received stated that continued involvement with the CHDF would result in a "shoot to kill" order against him. Shortly thereafter, Garrovillas made arrangements to leave the Philippines and eventually arrived in the United States. Besides his own testimony in support of his application, Garrovillas submitted two letters from Philippine government officials. The first letter, from Noli G. Bautista, a Chairman/Captain of the Municipality of Morong, Barangay San Pedro, certified that Garrovillas was formerly an agent of a Military Intelligence Unit and that his work led to the capture of several rebel elements. Mr. Bautista's letter stated that Garrovillas remains in danger of being assassinated by communist rebels, and that the government cannot grant any assurance of his safety in the Philippines should he return.

The second letter, from Domingo C. Abalos, a Captain of the Records and Archives division of the Philippine Army, further veri-

** The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

fied Garrovillas's prior service as a "confidential civilian employee" in the Intelligence Division. Mr. Abalos's letter neither addressed the nature of Garrovillas's work nor the current danger the NPA would present if he returned.

On July 6, 1995, the immigration judge (IJ) issued an oral decision denying Garrovillas's application. The IJ based his decision on three considerations: his finding that Garrovillas's testimony was not credible; his finding that the two supporting letters of Mr. Bautista and Mr. Abalos were unreliable; and a U.S. Department of State report indicating that although the NPA is still active in the Philippines, it is much weaker than it was in 1990. On April 30, 1996, the BIA issued its decision affirming the IJ's denial of the application. Garrovillas petitioned for review.

## ANALYSIS

### Standard of Review

In the instant case, rather than adopting the IJ's reasoning, the BIA stated that it conducted a *de novo* review of the record." When the BIA has conducted a *de novo* review, our review is limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted. *Ghaly v. INS*, 58 F.3d 1425, 1430 (9th Cir.1995). Any error committed by the IJ thus "may be 'rendered harmless' by the BIA's application of the correct legal standard." *Shirazi–Parsa v. INS*, 14 F.3d 1424, 1427 (9th Cir.1994) (quoting *Elnager v. INS*, 930 F.2d 784, 787 (9th Cir.1991)). The BIA's opinion, however, cannot be mere "boilerplate," and must describe with "sufficient particularity and clarity the reasons for denial of asylum." *Shirazi–Parsa*, 14 F.3d at 1427 (quoting *Castillo v. INS*, 951 F.2d 1117, 1121 (9th Cir.1991)).

We review the factual determinations of the BIA under the substantial evidence standard. *Shirazi–Parsa*, 14 F.3d 1424, 1429 (9th Cir.1994). The court must determine whether the BIA's conclusion, based on the evidence presented, is "substantially reasonable." Because the applicant bears the burden of proof to demonstrate eligibility for asylum, this court will reverse

" 'only if the evidence presented … was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed.' " *Id.* at 1427 (quoting *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). This standard does not "preclude a court from vacating and remanding a case for further consideration where the BIA's denial of asylum was based on an error of law." *Kotasz v. INS*, 31 F.3d 847 (9th Cir.1994).

### The BIA's Credibility Determination Is Not Supported by Substantial Evidence

The BIA found that petitioner Garrovillas's testimony was not credible. We review credibility findings, like other factual determinations, under the substantial evidence standard. *See Osorio v. INS*, 99 F.3d 928, 931 (9th Cir.1996). The BIA must have "a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief." *Id.* (quoting *Hartooni v. INS*, 21 F.3d 336 342, (9th Cir.1994)). Furthermore, any such reasons "must be substantial and bear a legitimate nexus to the finding." *Mosa v. Rogers*, 89 F.3d 601, 604 (9th Cir.1996). Generalized statements that do not identify specific examples of evasiveness or contradiction in the petitioner's testimony prevent us from conducting a proper review. Here, the BIA premised its finding that the petitioner was not credible on two grounds, both of which are insufficient to justify its determination.

First, the BIA noted an inconsistency between Garrovillas's 1990 application, which stated that he had been shot at, and his in-court testimony six years later, in which he testified that he had never been shot at. In *Turcios v. INS*, 821 F.2d 1396 (9th Cir.1987), we observed that "[u]ntrue statements by themselves are not reason for refusal of refugee status." *Id.* at 1400. During the hearing, Garrovillas offered an explanation as to why there was a discrepancy in the two statements: he said that his former attorney prepared his 1990 asylum application and that he had signed it without reading it. The BIA did not comment on Garrovillas's explanation, nor suggest any reason that it found his explanation not credible.

*See Osorio,* 99 F.3d at 933 (requiring Board or IJ, on remand, not only to identify specific inconsistencies, but also "address in a reasoned manner the explanations that [petitioner] offers for these perceived inconsistencies"). In itself, the inconsistency does not prove much. It is quite possible that the attorney who filed the application stretched the facts without informing Garrovillas. Moreover, there was no reason for Garrovillas to disavow the earlier statement other than a desire to correct an error of which he had not been aware. His revised story served to lessen the degree of persecution he experienced, rather than to increase it. In addition, there is nothing in the record to suggest that Garrovillas had any reason to fear that a false assertion would be exposed at the hearing. Thus, as far as we can tell from the record, the most likely explanation for the change is a desire to tell the truth and to correct a false statement that reflected no culpable conduct on his part. If the inconsistency were accompanied by other indications of dishonesty, we might deem the BIA's finding justified-had it offered a reason for rejecting Garrovillas's explanation. As this court announced in *Vilorio–Lopez v. INS,* 852 F.2d 1137 (9th Cir.1988), however, "minor inconsistencies" cannot serve as the sole basis for an adverse credibility finding. *Id.* at 1142. Nor can inconsistences of less than substantial importance for which a plausible explanation is offered.

Second, the BIA's opinion states that "[w]e also find it disturbing that the respondent repeatedly refused to answer questions directed to him at the deportation hearing." It fails, however, to refer to any specific examples of such behavior. From this single-sentence analysis, we cannot identify which of Garrovillas's responses were inadequate or which questions he refused to answer. As the BIA appears to have adopted the IJ's reasons for his negative credibility finding, we look to the IJ's decision for further guidance as to the basis of the BIA determination. *See Turcios,* 821 F.2d at 1401. The IJ's decision, however, like the BIA's opinion, fails to specify any particular instances in his testimony when Garrovillas refused to answer questions. The IJ says only that Garrovillas deliberately avoided "direct and truthful answers to a host of questions concerning his activities in the Philippines." That is insufficient.

Our review of the record does reveal that the IJ frequently expressed frustration at Garrovillas's responses, but these instances are better explained by language barriers, interpreter problems, and pervasive antagonism on the part of the IJ than by any evasiveness on the part of Garrovillas. Throughout the proceedings, the IJ acted with impatience and hostility toward Garrovillas, bullying and haranguing him from the inception of the hearing to its conclusion.[1]

---

1. When Garrovillas' counsel put him on the stand to elicit testimony in support of his application, the IJ immediately took over the questioning, firing inquiry after inquiry at Garrovillas in a prosecutorial manner. For example, the first series of substantive questions in the hearing went as follows:

    Q: (Garrovillas's attorney) Mr. Garrovillas, why are you seeking asylum here in the United States?
    A: Because I had received a letter that I would be killed.
    Q: (Judge interrupting) Do you have that letter?
    A: It was left in the Philippines.
    Q: Why, why did you leave it in the Philippines? You're a lot bigger than the letter, why didn't you, if you could come why couldn't the letter?

Later in the hearing, when Garrovillas' counsel was inquiring about his work as an informant for the CHDF, the IJ intervened with this series of questions:

    Q: Now how would you know so much about the NPA?
    A: Because there are a lot of them.
    Q: Well then why would the army need you? If there's a lot of NPA around and everybody knew about them, why would the army need you as an informer?
    A: Because they would not tell me.
    Q: And why were your credentials so much more impeccable than everybody else who lived in Morrong Rizal?
    A: They did not tell me since I go, leave often, you know, from the country.
    Q: I don't know what that means. You, why were you so much more reliable a source of information than everyone else in your community? I still don't understand. Can you tell me?
    A: They do not tell me. They would not tell me?
    Q: But why wouldn't they tell you? I, for example, am having doubts about you. Why wouldn't the army have doubts about you? I mean, for, I find you a person who

The IJ constantly interrupted the questioning and, in doing so, barely permitted Garrovillas's counsel to present his case. During the direct examination of Garrovillas, his counsel, Mr. Rodriguez, asked Garrovillas approximately thirty-two questions, while the IJ asked him seventy-nine. Similarly, during the cross-examination of Garrovillas by counsel for the INS, the IJ intervened frequently, asking twenty-two questions, while allowing the INS' counsel to ask twenty-eight, and treating Garrovillas with unremitting hostility. At one point during the cross-examination, when the IJ thought Garrovillas' answer to a question he had posed was incomplete, the IJ told him: "I've grown very tired of your unwillingness to answer my questions and I will remind you, sir, that I am the Judge in this case and that you are a guest in my country and that I expect you to answer the questions put to you directly, if you can." Although Garrovillas's answers were not always directly responsive, at no time did he refuse to answer a question. At several points during the hearing, however, the IJ made confusing and derisive innuendos-in one brief exchange he did so with

respect to the Pope, the Rabbi of Manila, and the Japanese Occupation,[2] and in another he accused Garrovillas of being an army deserter, talking at length about how a fellow judge was required to perform reserve duty despite his "exalted status as an Immigration Judge."[3] These inexplicable outbursts may have caused or exacerbated the communication problem for Garrovillas, especially given that these outbursts were conveyed to him by a Tagalog interpreter. In sum, the IJ demonstrated a predisposition to discredit Garrovillas's testimony, and his credibility determination cannot be considered objective or impartial.

We conclude that the BIA's adverse credibility finding is not supported by substantial evidence. By itself, the single discrepancy between Garrovillas's 1990 application and his hearing testimony six years later does not constitute an adequate basis for an adverse credibility finding, particularly in light of the BIA's failure to address Garrovillas's explanation regarding the inconsistency. We are especially wary of the finding that the petitioner was not credible because of the IJ's

finds it difficult to answer a direct question. That's usually not a sign of a person overly reliable. So I'm wondering why members of the Filipino army would find you so much more reliable as a source of information about Communist guerrillas than anyone else in your community. Why were you considered so reliable? Had you been a Communist guerrilla?

**2.** Q: (INS attorney) How did you get in contact with this person named Pedro?

A: It is a name given to me.
Q: (Judge interrupting) But that's not, I know that, I know that with you, sir, a direct answer is positively sacrilegious. But, Ms. McLean [the INS attorney] is, is attempting to do her job. I, myself have lost patience, but she is asking you not who Pedro is, not where he lived and not what his favorite color was, but how you contacted him when you wanted to share information?
A: Pedro is not a member of the CHDF.
Q: *I don't care if he's the Pope or the chief Rabbi of Manila.* How did you come to get into contact with him when you needed him? How did you reach Pedro?
A: He lives in one, you know, nearby to where I live.
Q: So did you visit him at his home? Go up to the door, knock on the door, ask for

Pedro and give him the information? Is that how you did it?
A: Yes, sometimes at home and sometimes at a public place.
Q: Oh, so you would share secret information with Pedro at a public place. Is that correct?
A: Yes, it is public. That's casual.
Q: *Well, I the Filipino army didn't have you under Japanese occupation or it would not have been able to do what it did so courageously in World War II.*

**3.** Q: (INS counsel) Sir, did you ever serve in the military?

A: No, but I did serve, ROTC Reserve.
Q: (Judge interrupting) Now sir, does that make you a deserter now in the Philippines military because you haven't reported for reserve duty since you came to this country?
A: No.
Q: Well, I, the reason I ask, sir, is one of my fellow Judge's [sic] is an officer in the U.S. Air Force Reserves and he can negotiate when he has to report, but there are a certain number of days he has to spend in uniform, despite his exhaulted [sic] status as an Immigration Judge, he can be arrested and prosecuted. Now, how come you can desert the reserves and he can't?
A: Why could I, why did I not desert?

open, persistent, and, we hope, unprecedented hostility towards the petitioner. On these grounds we find that the record does not support the IJ's adverse credibility determination or the BIA's reliance upon it. We therefore vacate the credibility finding. On remand, if the BIA concludes that Garrovillas's testimony is not credible, it must articulate with specificity any inconsistencies or evasions it finds in his testimony, must address in a reasoned manner the explanations that Garrovillas offers for the perceived inconsistencies or evasions, and must take expressly into consideration the extreme hostility the IJ exhibited toward Garrovillas throughout the hearing, commencing at its very inception, as well as the inevitable effect upon an individual seeking asylum of an interrogation conducted in so intimidating a manner by a government official supposed to be a neutral arbiter.[4]

*If Credible, Petitioner's Testimony Appears to Establish Past Persecution*

■ If, on remand, the BIA finds petitioner's testimony credible, it must thoroughly evaluate the evidence of past persecution on account of an actual or imputed political opinion. The BIA dismissed Garrovillas's appeal on the alternative ground that his testimony, even if believed, did not establish past persecution. It offered only a boilerplate explanation for this conclusion, in contravention of the well-established requirements of law. *See, e.g., Shirazi–Parsa,* 14 F.3d at 1427. Our review of the record reveals that Garrovillas's testimony, if true, appears to establish that he suffered past persecution from the NPA on account of political opinion and, thus, is entitled to a presumption of a well-founded fear of future persecution. *Prasad v. INS,* 101 F.3d 614, 617 (9th Cir.1996).

Between 1985 and 1988, Garrovillas served as an informant for the Civilian Home Defense Force (CHDF), a division of the Philippine Army, providing information about the NPA and the locations of its training camp. His role in the CHDF placed him in a position of unquestionable antagonism with the NPA. On three separate occasions between

January and April of 1989 he received letters threatening his life due to his involvement with the CHDF. Each letter contained a black ribbon which Garrovillas and other people in Morong commonly understood as the signature of an NPA assassination order.

Petitioner's participation in the CHDF and the NPA death threats he received as a result of his affiliation are persuasive evidence of past persecution on account of his actual political opinion and the political opinion imputed to him by the NPA. *See INS v. Elias–Zacarias,* 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (setting forth that political opinion can be demonstrated on the basis of the petitioner's own views, his political neutrality, or the political opinion imputed to him by his persecutors). Under similar circumstances, in *Sangha v. INS,* 103 F.3d 1482, 1487–88 (9th Cir.1997), this court found that the petitioner had demonstrated past persecution as a result of the threats of violence and death he received from a terrorist group. We announced that recruitment attempts and death threats "are sufficient to show persecution under the" Immigration and Nationality Act. *Id.* In the instant case, petitioner received three letters during a three month period indicating that the NPA intended to assassinate him on account of his affiliation with the Philippine Army. Just as Sangha's persecution was based primarily upon death threats, Garrovillas's fear of returning home resulted from the letters that were sent to his home threatening his life. *See also Gonzalez v. INS,* 82 F.3d 903, 909–10 (9th Cir.1996) (noting that repeated threats against petitioner, including marking her house, taking her ration card, and harassing her family, were sufficient evidence of past persecution).

■ Although Garrovillas provided documentary evidence of his past persecution and his political activities, corroborative evidence is not necessary for a petitioner to establish past persecution. "Because asylum cases are inherently difficult to prove, an applicant may establish his case through his own testimony alone." *Sangha v. INS,* 103 F.3d 1482,

---

4. If the services of an IJ are required in connection with any future processing of Garrovillas' application, the parties would be far better

served by the assignment to those proceedings of a different IJ.

1487 (9th Cir.1997). Nevertheless, Garrovillas presented two supportive letters from Philippine Army officials attesting to the past danger he experienced and the continuing threat to his safety in the Philippines. In reaching its decision, the BIA ignored these two letters entirely. The Immigration Judge considered the letters but gave them little weight on the grounds that they were not printed on letterhead and therefore appeared faked. Because corroborative evidence is *not* required, we need not resolve the issue of whether the IJ and the BIA should have accorded these letters greater weight. On remand, however, Garrovillas would be well-advised to attempt to authenticate the letters. It is possible that the INS, with its greater capabilities, could also adduce information that might be of assistance in evaluating their legitimacy.

If Garrovillas's testimony is deemed credible, the evidence he presented appears to be such that a reasonable factfinder would have to conclude that he suffered past persecution from the NPA on account of his political opinion. *See Elias–Zacarias,* 502 U.S. at 481, 112 S.Ct. 812. Nevertheless, we leave that determination, initially, to the BIA, confident that this time it will explain its decision in the manner required by law.

*Petitioner's Entitlement to a Legal Presumption of Eligibility*

An alien who establishes past persecution is presumed to have a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1)(i); *Prasad v. INS,* 101 F.3d 614, 617 (9th Cir.1996). Once a petitioner establishes his eligibility for this legal presumption, the burden shifts to the government to rebut it. Because the BIA found that Garrovillas did not establish past persecution, it did not afford him the presumption and, therefore, did not analyze the facts in order to assess whether the INS had rebutted the presumption by showing the effect of changed country conditions.

The BIA did quote two paragraphs of a State Department report finding generally improved conditions in the Philippines, but did not discuss its applicability to Garrovillas. Thus, it is not clear whether this quotation was intended to serve as a means of rebutting the presumption of a well-founded fear of future persecution. Our cases hold that "individualized analysis" of how changed conditions will affect the specific petitioner's situation is required. Information about general changes in the country is not sufficient. *See Osorio,* 99 F.3d at 933; *Berroteran–Melendez v. INS,* 955 F.2d 1251, 1257 (9th Cir.1992). In the absence of any explanation as to how any change in conditions in the Philippines would serve to rebut Garrovillas's particular fear of future persecution, the presumption stands unrebutted.

## CONCLUSION

On remand, the BIA must determine whether Garrovillas's testimony is credible. If it so concludes, it must then evaluate whether, as it appears, Garrovillas has established that he suffered past persecution and such persecution was motivated by his political views or the political views his persecutors attributed to him. Next, the BIA would be required to determine whether sufficient evidence exists to rebut the presumption of a well-founded fear of future persecution. In making that assessment, the BIA may give weight to reports of improved conditions in the Philippines, but only to the extent that they are applicable to Garrovillas's individual circumstances. Unless the BIA then finds that a preponderance of the evidence rebuts this presumption, Garrovillas would be eligible for a grant of asylum. Any future petitions filed by Garrovillas shall be assigned to this same panel.

**VACATED AND REMANDED.**