Aminisitai **TAGAGA**, Asinate Tagaga, Aminisitai Naitagaga, Nanise Naitagaga, Setita Naitagaga, and Melehola Naitagaga, Petitioners,

v.

**IMMIGRATION AND NATURALIZATION SERVICE**, Respondent.

No. 98–71251.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 17, 2000

Filed Sept. 21, 2000

Charles E. Nichol, San Francisco, California, for the petitioner.

John L. Davis, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Before: POLITZ,[1] REINHARDT, and HAWKINS, Circuit Judges.

REINHARDT, Circuit Judge:

Along with his family, Aminisitai Tagaga petitions for review of a decision of the Board of Immigration Appeals (BIA).[2] The BIA dismissed Tagaga's appeal and affirmed the immigration judge's denial of his requests for political asylum and withholding of deportation under the Immigration and Nationality Act, 8 U.S.C. §§ 1158 and 1253(h). We have jurisdiction under 8 U.S.C. § 1105a(a)[3] and grant Tagaga's petition for review.

## I.

We consider Aminisitai Tagaga's asylum application against the backdrop of racially based political discrimination in Fiji, a country which has a bare majority of ethnic Fijians, the remainder of the population being composed largely of ethnic Indians. The Alliance Party governed Fiji from the time the country gained independence from Great Britain in 1970 until 1987. In April 1987 the Indian-dominated Labour Party defeated the Alliance Party in an open and free election. One month later, Major General Sitiveni Rabuka led a military coup to overthrow the new government. Rabuka further consolidated power through a second coup that year. According to the U.S. State Department, the "stated purpose of the 1987 military coups was to ensure the political supremacy of the indigenous Fijian people." U.S.

1. The Honorable Henry A. Politz, Senior United States Circuit Judge for the Fifth Circuit Court of Appeals, sitting by designation.

2. The asylum applications of Aminisitai Tagaga's wife and four children depend on the outcome of Aminisitai's application.

3. The Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRI-

RA"), Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996), replaced this section with a new judicial review provision codified at 8 U.S.C. § 1252. However, because under IIRIRA's transitional rules this new review provision does not apply to petitioners like Tagaga whose deportation proceedings commenced before April 1, 1997, we continue to exercise jurisdiction under § 1105a(a). *See* IIRIRA § 309(c)(1).

Dep't of State, *Country Reports on Human Rights Practices for 1993* 635 (1994). During these coups the military regime arbitrarily arrested and detained Indo–Fijians, and it subsequently encouraged and condoned discrimination, harassment, and violence by ethnic Fijians against Indo–Fijians. In 1990 the regime implemented a new constitution ensuring political dominance by ethnic Fijians.[4] In 1992 Rabuka's political party won electoral control of the Parliament, and he became prime minister.[5]

Tagaga is an ethnic Fijian. As a career military officer, he had earned the rank of major and held a high-level position in the Army's engineering corps. Through his work Tagaga established strong ties with the Indian community of Fiji, and beginning in 1985 he became an active supporter of the Indian-dominated Labour Party. He frequently attended Labour Party meetings and eventually became responsible for providing security at these meetings. Tagaga believed strongly that Indo–Fijians deserved to be treated equally and have the same legal rights as others living in Fiji.

Following the first coup in May 1987, military personnel were ordered to cease contact with the Indian community. Tagaga did not do so. As he testified at the asylum hearing: "My relationship with the Indian community was too strong to have the ties broken." He continued to attend Labour Party meetings, even though he knew that undercover military intelligence agents also attended and had identified him. Military personnel warned Tagaga that if he did not discontinue his relations with the Indian community, he would face arrest and court-martial.

By the time of the second coup in 1987, Tagaga began to refuse orders from his superiors directing him to arrest and detain Indo–Fijians whom the military regime perceived as threats to its power. Tagaga "didn't want to see the Indian population suffer anymore." He even gave information to the Indian community regarding future planned arrests. On September 7, 1987, Tagaga was summoned to appear before a military court, and two weeks later he was prosecuted for disobedience of military orders, breach of discipline, insubordination, and conduct unbecoming an officer. At the court-martial, Tagaga expressed his political opinion that the coup was illegitimate and that the government should be democratic. The military court revoked his military privileges and sentenced him to six months house arrest.

In February 1988 Tagaga was ostensibly reinstated as a major, but denied privileges and authority commensurate with that rank. In July 1989 he was transferred to serve in the Fijian division of the United Nations peacekeeping forces in Lebanon. Tagaga believed that military officials transferred him in order to separate him from the Indian community in Fiji and also to punish him by separating

---

4. "The Constitution guarantees ethnic Fijians dominance of the Government by providing them with 37 of 70 seats in the elected lower house of Parliament.... In the Senate (an appointed body with essentially review powers and the right to veto legislation), ethnic Fijians hold 24 of the 34 seats.... Other constitutional features designed to ensure ethnic Fijian dominance include a requirement that the Prime Minister be an ethnic Fijian and selection procedures which virtually ensure that the President will also be an ethnic Fijian." U.S. Dep't of State, *Country Reports on Human Rights Practices for 1993* 633 (1994).

5. *See generally Singh v. INS*, 94 F.3d 1353, 1356–57 (9th Cir.1996). While the BIA re-

ferred in its opinion to general changes that had occurred in Fiji since the 1992 elections, the record does not contain any evidence of improved country conditions directly relevant to Tagaga's case. *See Garrovillas v. INS*, 156 F.3d 1010, 1017 (9th Cir.1998) ("Our cases hold that 'individualized analysis' of how changed conditions will affect the specific petitioner's situation is required."). As this court observed in a different asylum case, another military coup characterized by anti-Indian sentiment has recently taken place in Fiji. *See Chand v. INS*, 222 F.3d 1066, 1070 (9th Cir.2000). The occurrence of this coup does not affect our decision here.

him from his family and subjecting him to the division's notoriously poor living conditions.

In June 1990 a lieutenant colonel and close friend of Tagaga arrived in Lebanon. He informed Tagaga that military officials had in fact sent Tagaga to Lebanon for the purposes of separation and punishment; that he remained under constant surveillance; and that he would face arrest and treason charges if he returned to Fiji. This lieutenant colonel, Tagaga's commanding officer, advised him to leave the army and not return to Fiji. A second lieutenant colonel confirmed this information for Tagaga.

Tagaga decided to seek asylum in the United States. He went to the American Embassy in Israel and obtained visas for himself and his family.[6] He returned to Fiji without reporting to military headquarters, gathered his family, and fled to the United States. He entered this country in September 1990 under a visitor's visa that authorized him to stay until September 6, 1991. Six months prior to the expiration of his visa, he filed an application for asylum with the Immigration and Naturalization Service (INS). An asylum officer denied Tagaga's application, and the INS commenced deportation proceedings in October 1992. An immigration judge (IJ) heard Tagaga's renewed application for asylum and withholding of deportation in January 1995. In support of this application, Tagaga submitted letters from four Fijian military officers stating that he was sent to Lebanon for punishment and that his life and freedom would be in danger if he returned to Fiji.[7]

While stating that she was "extremely sympathetic to the situation of Mr. Tagaga" as it was "apparent he has very democratic beliefs and does not agree with the tact [sic] the current Fijian government has taken against the Indians and other minorities in Fiji," the IJ concluded that Tagaga had failed to establish a well-founded fear of persecution and rejected his application. The BIA affirmed.[8] Tagaga petitioned this court for review of the BIA's decision.

## II.

To establish eligibility for asylum, an applicant must prove that he is unable or unwilling to return to his home country because of a well-founded fear of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). A well-founded fear of future persecution may be established by proving either past persecution or "good reason" to fear "future persecution." *Navas v. INS*, 217 F.3d 646, 654 (9th Cir.2000) (quoting *Vilorio–Lopez v. INS*, 852 F.2d 1137, 1140 (9th Cir.1988)). The Attorney General has discretion to grant asylum to eligible applicants. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 428 & n. 5, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).

In reviewing the BIA's determination of eligibility for asylum, we apply a substantial evidence test. The BIA's decision must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38

---

6. Tagaga told embassy officials that he wanted to apply for political asylum, but was given visitor visas and instructed to apply in the United States.

7. One letter, dated May 14, 1992, states: "Major Tagaga's political opinion, social involvement and continuous association with the Indian businessmen, had jeopardized his outstanding military record[ ], whereby his career and freedom are no longer guaranteed by the Fijian Army. His life is in danger or in

a real life threatening situation. There is a possibility that the officer could face trial by court martial if he continues his military service." Three of the four officers sent notarized letters in 1994 confirming their earlier letters and substantiating their relationships with Tagaga.

8. Relying on their finding that Tagaga was ineligible for asylum, both the IJ and the BIA also found him ineligible for withholding of deportation.

(1992) (quoting 8 U.S.C. § 1105a(a)(4)); *Prasad v. INS,* 47 F.3d 336, 338 (9th Cir. 1995). Its decision must be reversed if a reasonable factfinder would have to conclude that the requisite persecution or fear has been shown. *Elias–Zacarias,* 502 U.S. at 481, 483–84, 112 S.Ct. 812; *Singh v. INS,* 134 F.3d 962, 966 (9th Cir.1998). Moreover, we must reverse the BIA's denial of withholding of deportation if such a factfinder would also have to conclude that it is more likely than not that the applicant would be subject to persecution if sent back to the country he fled. *See Cardoza–Fonseca,* 480 U.S. at 423, 107 S.Ct. 1207.

█ We hold that a reasonable factfinder would be compelled to conclude that Tagaga had a well-founded fear of future persecution, and that he also has met the higher burden for withholding of deportation. Tagaga established a substantial likelihood that he would be tried for treason if he returned to Fiji. His fear was not based on mere speculation, as the INS suggests, but rather on direct reports from high-ranking Fijian military officials. These officials informed Tagaga that he was sent to Lebanon to separate him from his family and the Indo–Fijian community and that he remained under constant military surveillance. They also stated specifically that were Tagaga to return to Fiji, he would face trial for treason and that his life and freedom would be placed in danger.[9]

While the BIA acknowledged that Tagaga "may indeed face a court martial" on his return, it concluded that the reason was his "abrupt departure from the army and his apparent AWOL status." Such status, it remarked, is "unrelated to a statutorily protected ground." This view of Tagaga's predicament is completely contrary to all of the facts in the record. The record is undisputed that Tagaga did not abandon his successful military career and flee his homeland because he was tired of the work or wanted a change in lifestyle. Rather, the uncontroverted facts establish that Tagaga, having already served a six-month sentence imposed by the military regime, fled Fiji because he feared that the regime would prosecute him for treason for, among other reasons, his refusal to participate in the regime's persecution of Indo–Fijians.

The INS argues that we should consider the sentence Tagaga served in 1987 and 1988 "disproportionately lenient" because Tagaga admits to having disobeyed his orders. It is well established, however, that a government may not legitimately punish an official for refusing to carry out an inhumane order. *See Barraza Rivera v. INS,* 913 F.2d 1443, 1451 (9th Cir.1990) (holding that punishment for "refusing to comply with military orders ... because they violate standards of human decency" can itself amount to persecution). This is a corollary of the universally recognized principle that obedience to superior orders does not relieve an official from responsibility for humanitarian law or human

9. Tagaga received these warnings firsthand from two officers in Lebanon. He also submitted, in support of his asylum application, four letters from Fijian military officials, dated 1991 and 1992, which conveyed the same information. In questioning the veracity of these letters, the BIA cited two concerns raised in an August 1993 advisory opinion by the U.S. State Department. First, the State Department noted that the similar language of the letters suggested that they were drafted by one person, not the individuals who signed them. Second, the State Department found it "unlikely" that active duty military officers would state in a public record that a fellow officer was under surveillance or that his life would be in jeopardy if he returned to Fiji. However, the State Department also remarked that "[t]he strength of the application may be affected by your interview or hearing, or additional information subsequently presented by the applicant." Tagaga, in fact, did submit additional information in support of these letters' veracity: notarized letters, sent in 1994, from three of the four military officers confirmed their earlier letters and explained how they knew Tagaga. Also, Tagaga explained at his asylum hearing that these officers were willing to divulge confidential information on his behalf because of their close personal relationship with him. These subsequent exhibits and information, not addressed by the BIA, resolved the concerns raised by the State Department.

rights violations.[10] Indeed, had Tagaga, following orders, directly participated in the persecution of Indo–Fijians, he would be ineligible for asylum under 8 U.S.C. § 1158(b)(2)(A)(i). *See also* 8 U.S.C. § 1101(a)(42) (excluding participants in persecution from definition of "refugee"). Tagaga adhered to higher principles of law by refusing to arrest Indo–Fijians and warning others of planned arrests. For this conduct, his punishment of six months confinement was not "disproportionately lenient." To the contrary, it was excessive, because it was unlawful.

■ Similarly, with regard to Tagaga's current "apparent AWOL status," we have held that "an alien may qualify for refugee status after either desertion or draft evasion if he or she can show that military service would have required the alien to engage in acts 'contrary to basic rules of human conduct.'" *Barraza Rivera*, 913 F.2d at 1451 (quoting Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status ¶ 170–71 (Geneva, 1979)[11]). Tagaga's unwillingness to participate in the race-based arrest and detention of Indo–Fijians meets that standard.

■ Like most human conduct, physical abuse or incarceration may have multiple motives. A guerilla group may beat and torture a factory worker in part because it wants money from her, but also because the worker opposes its political aims and refuses to join. *See Borja v. INS*, 175 F.3d 732, 735–36 (9th Cir.1999). We have held that a petitioner for asylum need not prove that his well-founded fear of persecution is based exclusively on a ground for refugee status enumerated under § 1104(a)(42)(A) ("race, religion, nationality, membership in a particular social

group, or political opinion"). Rather, so long as one of the motives for the feared persecutory conduct relates to a protected ground, the petitioner is entitled to that status. *Borja*, 175 F.3d at 736; *Rodriguez–Roman v. INS*, 98 F.3d 416, 430 n. 23 (9th Cir.1996); *Singh v. Ilchert*, 63 F.3d 1501, 1509 (9th Cir.1995).

Here, the BIA clearly erred in concluding that any court-martial that Tagaga would face on his return to Fiji would be "unrelated to a statutorily protected ground." Any reasonable factfinder would be compelled to conclude that a future court-martial of Tagaga by the military regime in Fiji would be motivated at least in part by his refusal to participate in the persecution of Indo–Fijians. His well-founded fear of persecution and the likelihood that it would eventuate were he returned to Fiji are based on his political opinion and activities.

### III.

Because Tagaga faces a well-founded fear of persecution on account of a statutorily protected ground, he and his family are eligible for asylum. We reverse and remand for the Attorney General to exercise her discretion in that respect. We also conclude, for the reasons stated above, that Tagaga has demonstrated that "it is more likely than not that [he] would be subject to persecution in the country to which he would be returned." *Cardoza–Fonseca*, 480 U.S. at 423, 107 S.Ct. 1207. He is therefore entitled to withholding of deportation.

PETITION FOR REVIEW GRANTED. REVERSED AND REMANDED

---

10. *See, e.g., Prosecutor v. Erdemovic,* Case No. IT–96–22–T, ¶ 15 (Int'l Crim. Trib. for Former Yugoslavia, Trial Ch. I, Nov. 29, 1996) (sentencing judgement), available at http://www.un.org/ICTY/erdemovich/trialc/judgment; 1 *Trial of the Major War Criminals before the International Military Tribunal* 12 (1947).

11. The United Nations Handbook provides "significant guidance" to courts in determining refugee status under United States asylum law. *Cardoza–Fonseca,* 480 U.S. at 438–39 & n. 22, 107 S.Ct. 1207; *Rodriguez–Roman v. INS,* 98 F.3d 416, 425–26 & n. 13 (9th Cir. 1996).

FOR FURTHER ACTION CONSISTENT WITH THIS OPINION.