**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ELMER DOMINGO MARCOS,
                    *Petitioner,*

v.

ALBERTO GONZALES, Attorney
General,*
                    *Respondent.*

No. 02-73968

Agency No.
A46-012-583

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted February 15, 2005**
San Francisco, California

Filed June 9, 2005

Before: Sidney R. Thomas, Susan P. Graber, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge Graber

---

*The court sua sponte changes the docket to reflect that Alberto Gon-
zales, Attorney General, is the proper respondent. The Clerk shall amend
the docket to reflect the above caption.

**This panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2)

**COUNSEL**

Helen B. Zebel, San Francisco, California, for the petitioner.

Susan K. Houser, Washington, D.C., for the respondent.

**OPINION**

PAEZ, Circuit Judge:

An immigration judge ("IJ") denied petitioner Elmer Domingo Marcos asylum, 8 U.S.C. § 1158, withholding of removal, 8 U.S.C. § 1231(b)(3), and relief under the Convention Against Torture ("CAT"), 8 C.F.R. § 208.16(c), after an administrative hearing. The IJ found that Marcos's testimony lacked credibility, that the scenario of death threats he described did not rise to the level of persecution, and that Marcos's fear of future persecution was undermined by changed country conditions in the Philippines. Marcos petitions for review of the Board of Immigration Appeals' ("BIA") decision affirming without opinion the IJ's ruling.[1] *See* 8 C.F.R. § 1003.1(e)(4) (2002). We have jurisdiction under 8 U.S.C. § 1252, and we review the IJ's decision as the final agency determination. *Singh v. Gonzales*, 403 F.3d 1081, 1083 (9th Cir. 2005). We hold that the IJ's decision was not

---

[1]Marcos also raises a due process challenge to the BIA's decision to streamline his case. *See* 8 C.F.R. § 1003.1(e)(4) (2002). That argument is foreclosed by *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 850 (9th Cir. 2003). In light of our disposition, Marcos's argument that the decision to streamline violates the streamlining regulations is moot. *See Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1253 (9th Cir. 2004).

supported by substantial evidence, and we remand for further consideration in light of this opinion.

## I.   Facts

Marcos, a native and citizen of the Philippines, worked as a medical technician for the Red Cross in Laoag City in the Philippines from July 1979 to June 1996, when he fled to the United States. Marcos owned an amateur or "HAM" radio, and in 1984 he joined the Philippine military's Civilian Home Defense Forces as a volunteer radio operator. He became vice-president of operations of the Regional Emergency Assistance Communication Team. Over his radio, Marcos reported any sightings of New People's Army ("NPA") members to the Philippine military.[2] Because the NPA knew the military's radio frequency and could listen to their broadcasts, Marcos used a security code to identify himself to military officials while shielding his identity from the NPA. In 1988 and 1989, the NPA made general threats over the radio "stating that they were going to kill members of the Civilian Home Defense Forces . . . ."

In 1990, however, the NPA discovered Marcos's name and identity when one of Marcos's crew members lost his car, along with a list of radio operators' names and security codes.[3] Marcos then began receiving personal threats from the NPA over the radio. He testified that he received about ten death threats every month in 1990 and 1991. Marcos was also threatened in person at times, at least once by an NPA member whom Marcos recognized and who called himself Scar Ben Hur. Scar Ben Hur came to the Red Cross office and

---

[2]The NPA is "a violent, revolutionary Communist group which actively opposes the Philippine government" and has "a well-documented history of political violence . . . ." *Borja v. INS*, 175 F.3d 732, 734 (9th Cir. 1999) (en banc).

[3]Marcos testified to this incident at his hearing although he did not include it in the declaration that he submitted with his asylum application.

threatened to kill Marcos if he did not stop reporting to the military. Marcos testified that he also received telephone threats at his house, sometimes as often as three to five times per day, from 1988 to 1995. He stated that he reported the threats to the military, and was provided with security at his office. The military did not provide 24-hour protection, however, and "could not apprehend" the NPA members who threatened Marcos, because, according to Marcos's testimony, "they only approach[ed] me whenever they knew that the security who is with me is out." Because he feared for his life and the military could not provide protection, Marcos testified that he stopped doing disaster relief work anywhere outside of his local municipality.

Marcos nonetheless continued his work for the Philippine military because he opposed the NPA's Communist philosophy. He continued to receive threats until he fled the country in 1996, although the threats decreased in frequency. Marcos testified that he received threats three to five times each month in 1992 and 1993, once or twice a month in 1994 and 1995, and approximately three times in 1996 until he left the Philippines. As he stated in his declaration, "[a]lthough it was unsafe for me to remain in the Philippines, I had no way to depart. Finally in 1996, my brother-in-law's relative visa petition for my wife became current" and Marcos was able to leave the Philippines as a derivative beneficiary of that petition.

The visa petition filed by Marcos's brother-in-law, Demetrio Edralin, had been approved in 1977; however, Edralin died in 1990. At the American consulate in the Philippines in 1996, Marcos provided an address on his visa application for his deceased brother-in-law. After Marcos had arrived in the United States, the Immigration and Naturalization Service charged that he had procured entry by fraud. Marcos, however, testified that he was unaware that Edralin's death made him ineligible for the visa; he claimed that his wife filled out the paperwork and that he signed it without

reading it. He testified that he didn't tell the INS that Edralin had died "because they didn't ask."

The IJ "d[id] not believe that [Marcos's] testimony [was] believable" because he "failed to disclose to the Consul the death of his brother-in-law." The IJ also cited Marcos's failure to produce documentation of his employment with the Red Cross, but did not comment on how that affected his credibility. The IJ also concluded that "the scenario of persecution, which the respondent described, does not rise to the level of that contemplated by the statute." She noted that the NPA had not "followed up on any threats," undermining any claim of past persecution. Finally, the IJ concluded that there had been "a substantial change in the country conditions" in the Philippines, which further undermined Marcos's petition. The IJ denied Marcos's application for asylum, withholding of removal, and relief under CAT, and denied voluntary departure. Marcos timely petitioned for review of that decision.

## II.   Credibility Determination

**[1]** We review the IJ's adverse credibility determination for substantial evidence. *Akinmade v. INS*, 196 F.3d 951, 954 (9th Cir. 1999). Our review focuses only on the actual reasons relied upon by the IJ. "[W]hen each of the IJ's or BIA's proffered reasons for an adverse credibility finding fails, we must accept a petitioner's testimony as credible." *Kaur v. Ashcroft*, 379 F.3d 876, 890 (9th Cir. 2004). The IJ must provide specific and cogent reasons to support an adverse credibility finding, and those reasons " 'must be substantial and bear a legitimate nexus to the finding.' " *Id.* at 884 (quoting *Salaam v. INS*, 229 F.3d 1234, 1238 (9th Cir. 2000)). We conclude that the reasons the IJ cited here are not valid grounds to support an adverse credibility determination, and we are therefore compelled to reverse that finding. *Id.* at 885.

The portion of the IJ's decision that bears on Marcos's credibility reads in its entirety:

> First the Court will comment upon the credibility of the respondent. The Court concludes that since the respondent failed to disclose to the Consul the death of his brother-in-law, the Court does not believe that the respondent's testimony is believable with regard to the asylum aspect of the case. The respondent claimed that he worked for the Red Cross; however, he has no identity document from the Red Cross. Respondent also does not have any documents showing that he resigned from the Red Cross.

Neither Marcos's erroneous visa application nor his failure to produce corroborating evidence from the Red Cross is a valid basis for an adverse credibility finding.

**[2]** First, Marcos's failure to disclose his brother-in-law's death on his visa application does not support an adverse credibility determination. "We have held . . . that inconsistencies in the petitioner's statements must go to the heart of his asylum claim to justify an adverse credibility finding." *Guo v. Ashcroft*, 361 F.3d 1194, 1201 (9th Cir. 2004) (quotation marks omitted). As we have explained, "if discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution [they] have no bearing on credibility.' " *Chen v. INS*, 266 F.3d 1094, 1100 (9th Cir. 2001) (quoting *Damaize-Job v. INS*, 787 F.2d 1332, 1337 (9th Cir. 1986)), *overruled on other grounds by* 537 U.S. 1016 (2002), *on remand to* 326 F.3d 1316 (9th Cir. 2003). We have drawn a clear distinction between "false statements made to establish the critical elements of the asylum claim [and] false statements made to evade INS officials." *Akinmade*, 196 F.3d at 956. Marcos's visa application falls squarely within the second category and thus "cannot serve as a basis for an adverse credibility determination." *Id*. The false statement is simply unrelated to the basis for Marcos's asylum claim.

**[3]** Contrary to the government's assertions, nothing in our caselaw suggests that, to be excusable, a lie must be told out

of fear; the underlying motive is not determinative. We have, for example, found that " 'the presentation of a fraudulent document for the purpose of escaping immediate danger from an alien's country of origin or resettlement, or *for the purpose of gaining entry into the United States*' " may be " 'fully consistent with the claim of asylum . . . .' " *Id.* at 955 (emphasis in original) (quoting *In re O-D-*, 21 I. & N. Dec. 1079, 1081 (BIA 1998)). Because *either* purpose is acceptable, fear cannot be a requirement—and Marcos's inadvertent failure to disclose his brother-in-law's death therefore has little bearing on his credibility.[4] Our cases do suggest that a petitioner's misrepresentations at entry in order to secure admission to this country can affirmatively *support* his claim of fear of persecution. *See Turcios v. INS*, 821 F.2d 1396, 1400-01 (9th Cir. 1987). But that in no way means that omissions such as Marcos's—which were unrelated to his fear of persecution—should detract from that claim.

[4] In *Turcios*, we noted that "[u]ntrue statements by themselves are not reason for refusal of refugee status and it is the examiner's responsibility to evaluate such statements in the light of all the circumstances of the case." *Id.* at 1400. The IJ in this case never undertook the required examination, and did not explain how the failure to disclose Edralin's death was relevant to Marcos's asylum petition. The government points out several inconsistencies in Marcos's testimony upon which the IJ *could* have based an adverse credibility finding. But the

---

[4]As noted above, Marcos testified that his failure to disclose Edralin's death was simply a misunderstanding rather than an attempt to avoid detection. The IJ never doubted the veracity of that testimony. Even if Marcos had lied at his asylum hearing about his reasons for the omission, however, that would not support an adverse credibility determination. *See Akinmade*, 196 F.3d at 956 ("Whether the petitioner was directly involved in falsifying the Canadian passport, or whether he lied about how he obtained his airline ticket from South Korea to the United States, has little, if anything, to do with whether he fled Nigeria for fear of persecution."). Marcos's visa application "concerns facilitating travel and entry into the United States and is 'incidental' to [his] claim of persecution." *Id.*

IJ did not in fact rely upon those inconsistencies, and we therefore cannot rely on them as part of our review of the IJ's decision.[5] "Because the IJ expressed no further concerns, and the only *explicitly articulated* reasons rested on impermissible factors, then we conclude from the IJ's opinion that [the petitioner] was an otherwise credible witness." *Damaize-Job*, 787 F.2d at 1338 (emphasis added).

[5] Finally, the IJ faulted Marcos for failing to provide documentation of his work for the Red Cross. Once we have determined that the IJ's proffered reasons for an adverse credibility determination are "insufficiently supported," however, an applicant "is not required to provide corroboration to establish the facts to which she testified."[6] *Kaur*, 379 F.3d at 890; *see also Gui*, 280 F.3d at 1227. In sum, because neither

---

[5]Furthermore, the IJ never suggested that the nondisclosure had any bearing on Marcos's "general propensity to tell the truth," as the dissent proposes. Dissent at 6733. Even if the IJ had, such a general finding would not provide the specific, cogent, and substantial reasons that we require to support an adverse credibility finding. *See Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002); *see also Chen v. Ashcroft*, 362 F.3d 611, 621 (9th Cir. 2004) (holding that an IJ's "general conclusion" that the petitioner's testimony, taken as a whole, was not credible, "amounts to no more than speculation and conjecture once we reverse each of the IJ's credibility findings" and thus could not support an adverse credibility determination).

[6]Although Marcos told the IJ he could produce the identity document, she demanded it immediately on the day of the hearing. Marcos does not raise an objection to the IJ's requirement; given our disposition we need not address this argument in any event. But we note that such a requirement raises serious due process concerns by depriving Marcos of his guarantee of "a reasonable opportunity to present evidence on his behalf . . . ." *See Cano Merida v. INS*, 311 F.3d 960, 964 (9th Cir. 2002); *see also Chen*, 362 F.3d at 620 ("we have held that due process requires that an applicant be given a second opportunity to establish eligibility for asylum where the adverse credibility determination was based, without notice to the applicant, on a failure to produce a relative as a corroborating witness"); *Campos-Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir. 1998) ("the BIA must provide a petitioner with a reasonable opportunity to offer an explanation of any perceived inconsistencies that form the basis of a denial of asylum").

ground cited by the IJ is supported by substantial evidence, we reject the adverse credibility determination and accept Marcos's testimony as true. *Kaur*, 379 F.3d at 890. We turn to the merits of his claim.

## III.   Eligibility for Asylum

**[6]** The IJ concluded that Marcos was ineligible for asylum both because he failed to demonstrate he had suffered past persecution and because he did not have a well-founded fear of future persecution. The IJ's finding regarding past persecution is supported by substantial evidence. Credible death threats such as Marcos received here can support a finding of past persecution. *See*, *e.g.*, *Garrovillas v. INS*, 156 F.3d 1010, 1016 (9th Cir. 1998) (holding that death threats from the NPA "are persuasive evidence of past persecution"). In *Lim v. INS*, however, we "avoid[ed] announcing a blanket rule that in every case threats, without more, compel a finding of past persecution." 224 F.3d 929, 936 (9th Cir. 2000). We noted that "[t]hreats standing alone . . . constitute past persecution in only a small category of cases, and only when the threats are so menacing as to cause significant actual 'suffering or harm.' " *Id.*; *see also Hoxha v. Ashcroft*, 319 F.3d 1179, 1182 (9th Cir. 2003). Here, we do not decide whether the evidence Marcos presented would permit a finding of past persecution; given our discussion in *Lim*, it is clear that Marcos has not presented evidence that *compels* such a finding. 224 F.3d at 936. We therefore do not disturb the IJ's conclusion that Marcos has not demonstrated past persecution.

**[7]** Marcos is nonetheless eligible for asylum based on fear of future persecution because he has demonstrated a reasonable possibility that he will suffer persecution if he were to return to the Philippines. 8 C.F.R. § 208.13(a), (b)(2)(i)(B). To suffice under this standard, a future threat "need not be statistically more than fifty-percent likely; . . . even a one-tenth possibility of persecution might effect a well-founded fear." *Lim*, 224 F.3d at 934. "For a fear to be well founded,

it must be both subjectively genuine and objectively reasonable." *Id.* The IJ's conclusion that Marcos had not met his burden was not supported by substantial evidence. *Kaiser v. Ashcroft*, 390 F.3d 653, 657 (9th Cir. 2004).

[8] First, the IJ noted that the NPA had not followed through on any of its threats against Marcos. But, as we have held, "that none of the threats against Petitioner[ ] have yet to be carried out does not render [his] fear unreasonable." *Id.* at 658. "What matters is whether the group making the threat has the will or ability to carry it out." *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir. 1984) (cited in *Kaiser*, 390 F.3d at 658-59). The NPA had both the will and the ability here. *See Briones v. INS*, 175 F.3d 727, 729 (9th Cir. 1999) (en banc); *see also* U.S. Department of State, Philippines Country Report on Human Rights Practices for 1997 ("Country Report") at 4.

[9] Second, the IJ found that Marcos's application was undermined by "a substantial change in the country conditions" in the Philippines. To support this conclusion, the IJ cited only the 1997 Country Report, which, she noted, "indicates that the government generally respects the human rights of its citizens." *See* Country Report at 1. This statement in the Country Report, however, does not undermine Marcos's well-founded fear of persecution at the hands of the NPA, a non-governmental group; Marcos does not claim that the Philippine *government* poses any threat to him.**[7]** The Country

---

**[7]**In any event, the IJ took this phrase out of context. The 1997 Country Report in fact states:

> The Government generally respected the human rights of its citizens; however, there were problems in some areas. Members of the security forces were responsible for extrajudicial killings, disappearances, torture and other physical abuse of suspects, and arbitrary arrest and detention.

Country Report at 1. Furthermore, the State Department's 1998 Profile of Asylum Claims and Country Conditions regarding the Philippines

Report itself is inconsistent with the IJ's conclusion, and states: "Although the Communist insurgency, with its military wing the New People's Army (NPA), is greatly reduced from its height in the 1980s, NPA insurgents killed many persons, including civilians." *Id.* at 4. To conclude that country conditions had changed, in short, the IJ relied on grounds that were irrelevant to Marcos's petition. The "mitigating factors cited by the [IJ] are insufficient to obviate [the petitioner's] reasonable fear." *Lim*, 224 F.3d at 935.

The IJ here, of course, did *not* rely on the diminished strength of the NPA to support her decision. Even if she had, however, such reasoning is insufficient to support the denial of asylum under our cases involving very similar facts. In *Briones*, for example, we reversed the BIA's determination that the petitioner's fear of persecution at the hands of the NPA was unreasonable. 175 F.3d at 728. We noted, "[i]f the NPA will kill business people who do not contribute to their cause, it takes little imagination to understand what they would do to a successful informer for the Phillipine [sic] military." *Id.* at 729. On the basis of the State Department Country Report in evidence before the IJ in *Briones*,[8] we concluded that "the NPA, although somewhat weaker than before, remains capable of killing its opponents." *Id.* In *Lim*, we reaffirmed our decision in *Briones* and, "despite some evidence that might mitigate the probability of persecution," we held that the evidence compelled the conclusion that the petitioner had a well-founded fear of future persecution based on threats

("Profile"), which the IJ admitted into evidence, notes that "[n]ongovernmental organizations (NGO's), which include the Commission on Human Rights (CHR), place the blame for the majority of human rights abuses, including extrajudicial killings, on police and military forces." Profile at 3.

[8]It is unclear which year the Country Report admitted in evidence in *Briones* was published. The administrative hearing in that case was held on April 26, 1996 and the BIA's decision was issued on March 10, 1997. Opening Brief for the Petitioner, *Briones* (No. 97-70321).

from the NPA. 224 F.3d at 935. We considered the IJ's finding in *Lim* that "the strength of the NPA has been substantially diminished in the Philippines" insufficient to support the denial of asylum. *Id.* at 933; *see also Mejia v. Ashcroft*, 298 F.3d 873, 877 (9th Cir. 2002).

Neither did the IJ here rely on grounds specific to Marcos's testimony. While Marcos did testify that the threats on his life decreased over time, from approximately ten times per month in the first years to three times in the first half of 1996, the IJ did not rely on that testimony as a basis for her decision. Furthermore, Marcos's account actually supports his legal claim and corroborates the 1997 Country Report's description of the NPA's decreasing power. As Marcos testified, the years 1989 to 1990 were "the height of the NPA" in his county. In 1996, nonetheless, Marcos received three death threats in fewer than six months from an organization with "a well-documented history of political violence, including the murder of its opponents." *Borja*, 175 F.3d at 734. The fact that these threats occurred less frequently than before does not support the IJ's conclusion that Marcos's fear of future persecution was unreasonable.[9]

**[10]** Finally, the IJ here "failed to apply the relevant facts in the [State Department reports] to the specific threat faced by [the petitioner]." *Id.* at 739. As noted above, the IJ relied only on her irrelevant conclusion that the Philippine government "generally respects" human rights. But, while other excerpts of the Country Report cite changing conditions and decreasing NPA power, the IJ did not make any individualized determination whether the changed conditions reported

---

[9]The dissent points out that Marcos's family remained unharmed in the Philippines. Dissent at 6734. As we have stated, this fact does not mitigate a well-founded fear of persecution because Marcos's family is not "similarly situated to the applicant"—his family members were not NPA informers for the Philippine government. *Lim*, 224 F.3d at 935. In short, "nothing in the record supports an inference that their safety ensures that [the petitioner] will be safe." *Id.*

in the Country Report will affect Marcos's specific situation. *See id.* at 738. An "individualized analysis" is *required* in this circuit, and the IJ "erred as a matter of law in failing to do the requisite analysis." *Id.* at 739 (citing *Garrovillas*, 156 F.3d at 1017).

## IV.   Conclusion

**[11]** The IJ's adverse credibility determination was not supported by substantial evidence. Taking Marcos's testimony as true, therefore, we conclude that, although the evidence does not compel a finding of past persecution, Marcos has established a well-founded fear of future persecution by the NPA if he were to return to the Philippines. Moreover, we conclude that the IJ's determination of changed country conditions was not supported by substantial evidence. We remand for further proceedings, accepting Marcos's testimony as credible and as establishing a well-founded fear of future persecution, to determine his eligibility for asylum, withholding of removal, and relief under CAT. *See He v. Ashcroft*, 328 F.3d 593, 603-04 (9th Cir. 2003).

**PETITION FOR REVIEW DENIED in part, GRANTED in part, and REMANDED.**

---

GRABER, Circuit Judge, dissenting:

I respectfully dissent.

In 1996, in a sworn visa application, Petitioner listed his brother-in-law's current address at a house in Virginia, even though he knew that the man had died six years earlier. Petitioner claimed that he had not read the form that his wife filled out. But it was his form that contained the fraud.

Although our past cases do hold, as the majority notes, page 6725, that an applicant's lie to gain entry to the United

States does not necessarily prejudice the applicant's later asylum application, I do not read those cases as going so far as to say that an IJ may not consider a past lie or act of fraud to bear on an applicant's general propensity to tell the truth. To the contrary, our cases have noted that an applicant's misrepresentations should be assessed in view of *all the circumstances of the case*. *See Turcios v. INS*, 821 F.2d 1396, 1400 (9th Cir. 1987) (holding that, although untrue statements on an application are not reason alone to refuse refugee status, "it is the examiner's responsibility to evaluate such statements in the light of all the circumstances of the case"). Here, the past fraud provided a legitimate basis for the IJ to seek corroborating evidence, because the fraud called into question Petitioner's truthfulness. *See Guo v. Ashcroft*, 361 F.3d 1194, 1201 (9th Cir. 2004) (holding that, when an applicant's credibility is in question, the IJ's or BIA's adverse inference will withstand appellate review if the applicant failed to produce material, non-duplicative, available corroboration); *Sidhu v. INS*, 220 F.3d 1085, 1090-92 (9th Cir. 2000) (same). This is not a case — like *Akinmade v. INS*, 196 F.3d 951 (9th Cir. 1999), and *Turcios*, for example — in which the applicant lied out of fear of immediate danger or fear of future persecution, motivating the desire to gain entry into the United States. Petitioner says, instead, that he lied out of laziness.

Additionally, Petitioner's declaration stated that he was threatened in 1988-89, whereas he testified instead that the threats occurred in 1989-96. This huge discrepancy goes to the heart of his asylum claim because, among other things, it affects the reasonableness of his claimed fear of future persecution. Similarly, Petitioner testified that the NPA knew his name and knew him "particularly," yet stated in his declaration that he simply was worried that the NPA *might* figure out his identity. This significant discrepancy, too, goes to the heart of the asylum claim.

Although the IJ did not rely on those two discrepancies as reasons to disbelieve Petitioner, and thus we cannot rely on

them *directly* to support denial of the petition, this credibility-undermining information is part of the record that supports the IJ's insistence on receiving easily available, material, non-duplicative corroborative evidence. In my view, therefore, the IJ properly relied on the absence of such corroborating evidence to disbelieve Petitioner. I would affirm the adverse credibility finding on that ground.

Alternatively, the finding that Petitioner would not be subject to future persecution is supported by substantial evidence. I agree with the majority that the record does *not* compel a finding of past persecution, p. 6728, so no presumption of future persecution operates in Petitioner's favor. *See Molina-Estrada v. INS*, 293 F.3d 1089, 1094 (9th Cir. 2002) (noting that a failure to establish past persecution does not trigger a presumption of future persecution). As the majority concedes, p. 6731, the State Department Country Report describes improved conditions in the Philippines. *See id.* at 1096 (concluding that when a petitioner has not established past persecution, the IJ may rely on a State Department report in considering whether the petitioner has demonstrated that there is a good reason to fear future persecution).[1] The record demonstrates that Petitioner's own situation improved, too. Petitioner admitted in his testimony (assuming that it was credible) that the threats against him had decreased over time, from around ten times per month in the period 1989 to 1991, tapering to three times during all of 1996 — which *individually* corroborates the country reports in Petitioner's own case. Moreover, Petitioner's wife, child, parents, brother, and sister live in the Philippines without problems. *See Lim v. INS*, 224 F.3d 929, 935 (9th Cir. 2000) (holding that ongoing family safety can be used to "mitigate a well-founded fear, particu-

---

[1]The IJ relied on the State Department report to find "that there has been a substantial change in the country conditions." She also relied on Petitioner's individual situation when she observed that the NPA had never followed up on any of the previous threats (assuming them to be credible).

larly where the family is similarly situated to the applicant and thus presumably subject to similar risk").

For these reasons, under our deferential standard of review, the petition must be denied. I respectfully dissent from the majority's contrary conclusion.