**Manraj Singh SIDHU, Petitioner,**

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.**

No. 98–71363

INS No. A–70–636–921

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 4, 2000

Filed July 20, 2000

As Amended on Denial of Rehearing
Sept. 27, 2000

---

Hilary A. Han (argued), Robert B. Jobe, Law Office of Robert B. Jobe, San Francisco, California, for the petitioner.

Christine A. Bither, U.S. Department of Justice, Civil Division, Washington, D.C., for the respondent.

Before: BROWNING, HALL, and SILVERMAN, Circuit Judges.

HALL, Circuit Judge:

Petitioner Manraj Singh Sidhu is a citizen of India seeking asylum in the United States. On February 22, 1996, an Immigration Judge ("IJ") held a hearing on the merits of Petitioner's application and denied his asylum claim on the basis of an adverse credibility determination. The Immigration Judge also denied Petitioner's request for voluntary departure. On November 9, 1998, the Board of Immigration Appeals ("BIA") affirmed the IJ's denial of asylum, but reversed the IJ's determination that Petitioner is not entitled to voluntary departure. The BIA affirmed the adverse credibility finding after conducting a de novo review of the administrative record. Petitioner filed a timely petition for review by this Court. The BIA had appellate jurisdiction over the IJ's decision under 8 C.F.R. § 3.1(b)(2). We have jurisdiction over this petition pursuant to 8 U.S.C. § 1105a(a)(2), and grant it.

## I.

Petitioner is a 26–year–old Indian male who was born and raised in Chandiagarh, Punjab. Petitioner claims that he is a member of the Sikh faith, and belongs to a locally prominent, religious, Sikh family. Petitioner claims that he was persecuted both by Sikh separatists and by the Indian government. Petitioner's persecution claim mainly stems from an incident on his family's farm.

According to Petitioner's testimony, in mid-June, 1989, a group of five men came to the Sidhu home and asked for food and shelter. The men all wore orange clothes and blue or orange turbans, carried small ceremonial swords, and wore long beards. Petitioner's father refused their request for food and shelter. At that point, one of the men pointed a firearm at Petitioner's father and demanded assistance, explaining that the group was engaged in a violent struggle to end the torture being inflicted upon Sikhs in India. Petitioner protested to the militants, arguing that they should not be harassing his family. In response, one of the militants pointed a gun at Petitioner and urged him to help the militants in their cause.

Petitioner's family then complied with the militants' demands, providing them with food and shelter. As they were leaving, the militants stole one of the family's tractors. Petitioner's family could not report the theft to the police immediately because the phone lines were down, and it was evening. Shortly thereafter, the militants were involved in a skirmish with the Indian police. As a result, all the militants either were killed or fled. The following morning, four police officers arrived at the Sidhu farm, having traced the tractor to Petitioner's family.

The police placed Petitioner under arrest on suspicion of being a member of the militant Sikh group. At the nearby city's police station, the officers began interrogating Petitioner. During the course of the interrogation, they repeatedly beat and kicked Petitioner and denied him food. The officers also employed a "roller treatment" whereby the officers forced Petitioner to lie down on a bench while they pressed on a wooden bar that was placed over his legs. This "roller treatment" was quite painful and rendered Petitioner unable to walk for days. The police continually tried to prompt Petitioner to admit membership in the militant organization. Petitioner testified that the police were particularly interested in securing a con-

fession from him so as to embarrass Petitioner's father, a prominent Sikh political activist. If Petitioner confessed to being part of a militant Sikh group, his father's position as a nonviolent, mainstream Sikh activist would be undermined. After nine or ten days, Petitioner's father paid a 50,-000 rupee bribe to the police in order to secure his son's release. Nevertheless, the incident had caused the police to open a police file on Petitioner, and the police warned Petitioner's father that any time Petitioner came into the city he would be arrested. Petitioner testified that he felt that if he ever came across the police, they would stage a "false encounter" and use the excuse to kill him.

The following morning, Petitioner fled to New Delhi, where he resided with his uncle. Petitioner testified that he lived as a student in New Delhi, maintaining a very constrained lifestyle so as to avoid encountering police officers. About three months after his arrival, Petitioner had the misfortune of witnessing a kidnaping and getting a close look at the driver of the get-away car. Days later, Petitioner was spotted by one of the kidnapers, and was chased through the town. In light of his police record, Petitioner felt unable to go to the police for assistance. Constantly feeling endangered from the police and the kidnapers, Petitioner obtained a tourist visa to visit the United States and overstayed that visa. Petitioner's family also left India within the next few years.

After a hearing, an IJ denied Petitioner's asylum request on the basis of an adverse credibility finding. The BIA conducted an independent review of the record and also found Petitioner not credible.

## II.

 Where, as here, the BIA conducts an independent review of the IJ's findings, this Court reviews the BIA's decision and not that of the IJ. *See Perez v. INS*, 96 F.3d 390, 392 (9th Cir.1996). This Court must determine whether substantial evidence supports the BIA's adverse credibility finding. *See de Leon–Barrios v. INS*, 116 F.3d 391, 393 (9th Cir.1997).

## III.

 Although the IJ based his adverse credibility determination on a number of factors, the BIA apparently saw only two valid reasons for viewing Petitioner as not credible. First, the BIA noted that Petitioner "gave varying answers regarding his father's date of entry into this country." Second, the BIA noted that Petitioner "did not have his father testify on his behalf, and provided an 'explanation' for this failure that we simply do not find believable."

It is clear from the record and the case law that the BIA's first basis for finding Petitioner not credible does not constitute substantial evidence. During the INS's cross examination of Petitioner, the following exchange occurred:

Q. Where does your father live?

A. He is—at present he is in the United States.

Q. What is his immigration status?

A. Same as mine.

Q. When did he come to the United States?

A. I don't remember the exact date. I think it was two or three years back.

Q. Two or three years ago. Approximately what year, sir?

A. '94—93. I don't have the exact date.

Q. Approximately when?

Petitioner's counsel then objected, stating that the question had been asked and answered. The judge overruled the objection, stating that Petitioner had been "so precise on dates and years on direct examination it's appropriate to further recall on cross." Petitioner then answered the question:

A. '93.

Q. When in 1993?

A. September.

Shortly thereafter, INS counsel pointed out to Petitioner that at his November 14, 1994, asylum interview, he had told his

interviewer that his father was living safely on his farm [in India] at that time. Upon hearing this account, Petitioner corrected his earlier testimony, stating that his father came to the United States very shortly after the interview. Petitioner subsequently testified on two separate occasions that his father had indeed come to the United States after his asylum interview, and that he had earlier been forced to guess incorrectly that September 1993 was the date of his father's arrival in the United States. A reading of the record reveals that Petitioner merely made an erroneous guess when asked about the date of his father's arrival, that Petitioner had no incentive to lie about the date, and that Petitioner on several occasions tried to correct his testimony in a manner consistent with his earlier statement at his asylum interview. Moreover, other than INS's desire to catch Petitioner in a lie, it is altogether unclear why the date of his father's arrival in the United States was in any way relevant to Petitioner's claim. No one disputes that Petitioner's father was in India at the time of the alleged persecution.

Under Ninth Circuit law, the discrepancy in the testimony described above is not a sufficient basis for an adverse credibility determination. *See Campos–Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir.1999) ("Inconsistencies of less than substantial importance for which a plausible explanation is offered cannot form the sole basis for an adverse credibility finding.") (citation and internal quotation marks omitted); *Garrovillas v. INS*, 156 F.3d 1010, 1014 (9th Cir.1998) (reversing an adverse credibility finding based on discrepancy between an asylum application and testimony where "the most likely explanation for the change is a desire to tell the truth and to correct a false statement that reflected no culpable conduct on his part"); *Vilorio–Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir.1988) ("Minor inconsistencies in the record such as discrepancies in dates which reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for

an adverse credibility finding.") (citation omitted).

In short, the discrepancy between Petitioner's asylum interview and his testimony was based on his admittedly fuzzy recollection of that date, and Petitioner immediately clarified his actual testimony to explain any discrepancy. The fact that Petitioner had testified with great specificity about dates on which the alleged persecution took place, but had difficulty recalling the date of his father's emigration, was not substantial evidence supporting an adverse credibility determination.

### IV.

The second basis for the BIA's credibility determination stemmed from the failure of Petitioner's father to appear at Petitioner's hearing. Petitioner testified on cross-examination that his father lives with him in Yorba Linda, California. At that point, the following exchange occurred between Petitioner and INS counsel:

Q. Sir, do you have any proof that your father's in the United States?

A. Other than himself? I mean do you want to see him or—yes, I do. You can—.

Q. Do you have it here in Court?

[Petitioner's counsel objects, and the objection is overruled.]

Q. Sir, do you have any proof that your father is in the United States?

A. What type of proof do I need to submit?

Q. Sir, is that no? Do you have anything in Court today?

A. No. Today? No.

. . .

Q. Sir, is there—is there any reason your father isn't here in Court today to corroborate your testimony?

. . .

A. Well, I did not feel that it was very relevant for him to come with me today because I do carry a very

separate asylum application and for him to be here today—I didn't feel it was relevant.

It takes approximately 45 minutes to drive from downtown Yorba Linda to downtown Los Angeles, where the hearing before the IJ was held. The IJ, INS attorney, and BIA were therefore puzzled as to why a critical corroborating witness was not called by Petitioner to bolster his case. Petitioner's testimony included allegations suggesting that the police had arrested him in part as a way to embarrass his father, who was a politically active Sikh. Petitioner also testified that his father witnessed many of the events described, and had first-hand knowledge of much of the persecution. Indeed, Petitioner's father was the *only* witness to some events that are at the core of his asylum application. For example, only Petitioner's father heard the Indian Police's alleged threats that they would harass Petitioner after his release from custody.

On appeal, Petitioner submits that he and his lawyer made a poor strategic decision by declining to bring his father to the hearing, but argues that because an alien's own testimony alone can suffice to support an asylum claim, it was improper for the BIA to discredit his testimony on that basis.[1] Petitioner's argument is based on his reading of the relevant INS regulations, 8 C.F.R. § 208.13(a), and our case law.

The plain text of the INS's regulations belies Petitioner's interpretation of them. Under 8 C.F.R. § 208.13, the "burden of proof is on the applicant for asylum to establish that he or she is a refugee as defined in section 101(a)(42) of the Act. The testimony of the applicant, *if credible*, may be sufficient to sustain the burden of proof without corroboration." (emphasis added). This language plainly indicates that if the trier of fact either does not believe the applicant or does not know what to believe, the applicant's failure to corroborate his testimony can be fatal to his asylum application. Thus, the regulations unambiguously contemplate cases where an applicant's testimony alone will not satisfy his burden of proof.[2] As we explain below, those cases include instances where an applicant inexplicably fails to present easily available, material, non-duplicative, corroborating evidence to support his asylum claim.

Crediting Petitioner's testimony, the testimony of his father would have been highly probative, non-duplicative, corroborating evidence. And no reading of the INS's regulations or Ninth Circuit case law supports Petitioner's conclusion that his failure to bring forward easily available corroborating evidence has no bearing on his asylum application. *Mejia–Paiz v. INS*, 111 F.3d 720, 724 (9th Cir.1997), is the only Ninth Circuit opinion that squarely confronts a situation in which an IJ based an adverse credibility finding on an alien's

---

1. If Petitioner's trial counsel actually believed that Petitioner's father would corroborate Petitioner's testimony, but nevertheless advised Petitioner not to bring his father to the IJ hearing, then trial counsel's performance is open to serious question. Because Petitioner does not assert that his trial counsel's decision was so poor as to render him ineffective, we do not address the claim here.

2. Petitioner argues that a failure to corroborate testimony can never be held against an asylum applicant. We reject this argument categorically. Petitioner had provided no sensible reason why we should establish a rule that creates a disincentive for asylum applicants to bring forward highly pertinent information. Corroborating evidence is often

scarce in asylum proceedings, but where it is easily available, no rational legal regime would discourage applicants from bringing it to the attention of the trier of fact. As our recent opinion in *Ladha v. INS,* 215 F.3d 889 (9th Cir. 2000), makes clear, *Ladha*'s holding—that corroboration of credible testimony is unnecessary—has no bearing on the question of whether failure to corroborate can justify an adverse credibility determination. *See id.* at 900 n. 11 ("We do not address if or when it is proper to consider the 'availability' of corroborating evidence as a basis for an adverse credibility finding; we are concerned only with the body of cases addressing corroboration *after* a finding that an applicant is credible.").

failure to produce readily accessible, material corroborating evidence. In that case, the IJ based an adverse credibility finding on the petitioner's inability to provide documentary evidence that he was a member of the Jehovah's Witness Church. Under a caption entitled "The IJ's Credibility Finding," we wrote:

> First, the IJ found that petitioner could have offered proof that he was a member of the Jehovah's Witnesses but did not. The IJ reasoned that establishing membership through either a local or foreign church would have been a relatively uncomplicated task. We agree. In fact, the petitioner himself claimed in his application for asylum that many of his problems were due to the fact that there was proof of his membership "in the files of the Jehovah's Witnesses Church," presumably in Nicaragua. Petitioner cannot have it both ways. Proving one's membership in a church does not pose the type of particularized evidentiary burden that would excuse corroboration.

*Id.* at 723–24. Thus, in *Mejia–Paiz*, the Court determined that where material corroborating evidence was easily available to the asylum seeker, i.e., it "does not pose the type of particularized evidentiary burden that would excuse corroboration," failure to produce such evidence can constitute substantial evidence supporting an adverse credibility determination. Membership records contained in the files of a Nicaraguan church were easily available enough for the trier of fact to expect their production.

In the case at bar, it would have been much easier for Petitioner to produce his father's testimony than it would have been for Mejia–Paiz to produce evidence of his membership in a Nicaraguan church. Petitioner unambiguously testified that his father was living in a nearby suburb. Petitioner's father had an asylum application pending before the INS, and therefore had

no reason to fear attending the hearing before the IJ. Petitioner never testified that his father was ill, out of town, or otherwise indisposed. And while it certainly would have been preferable for the IJ to adjourn the hearing so that Petitioner's father could be called to testify, Petitioner's counsel never moved for such an adjournment, and Petitioner, quite sensibly, does not argue on appeal that the IJ plainly erred by failing to order an adjournment *sua sponte*. It appears from the record that counsel for the INS believed that the father's testimony would differ from the son's, and made an issue out of the father's absence for that reason. The IJ and BIA might well have inferred that Petitioner knew that his father could not corroborate Petitioner's testimony, and chose not to call him as a witness for that reason. Such an inference would not have been unreasonable.

■■■ We do not read *Mejia–Paiz* to reject all limitations on an IJ's ability to surprise an asylum applicant with an adverse credibility determination. The petitioner must be given an opportunity at his IJ hearing to explain his failure to produce material corroborating evidence.[3] Moreover, the corroborating evidence must be both material to the petitioner's asylum claim and non-duplicative of other corroboration. Thus, where an applicant produces credible corroborating evidence to buttress an aspect of his own testimony, an IJ may not base an adverse credibility determination on the applicant's failure to produce additional evidence that would further support that particular claim.[4] Finally, as we have indicated, the evidence must be easily available. As we held in *Lopez–Reyes v. INS*, 79 F.3d 908, 912 (9th Cir.1996), it is inappropriate to base an adverse credibility determination on an applicant's inability to obtain corroborating affidavits from relatives or acquaintances living outside of

---

3. In this case Petitioner was specifically asked to explain the lack of corroboration and presented an explanation that both the IJ and BIA explicitly found incredible.

4. Nor may an IJ base an adverse credibility finding on his disbelief of an applicant's explanation for his failure to produce duplicative evidence.

**1092**

the United States—such corroboration is almost never easily available.

In conclusion, where the IJ has reason to question the applicant's credibility, and the applicant fails to produce non-duplicative, material, easily available corroborating evidence and provides no credible explanation for such failure, an adverse credibility finding will withstand appellate review. However, because of the due process concerns discussed below, we remand for a new hearing in the case at bar.

### V.

Petitioner argues that his due process rights were violated because he was never given notice that the IJ could question his credibility based on his failure to present his father as a witness. If the IJ or BIA had considered Petitioner's case subsequent to our decision in *Mejia–Paiz*, we would reject his argument without hesitation. But as it stands, Petitioner's IJ hearing preceded our decision in *Mejia–Paiz* by fourteen months, and the deadline for the filing of Petitioner's BIA brief was eleven months before *Mejia–Paiz*. Because *Mejia–Paiz* established a clear rule on a legal issue that had previously been unsettled, both under our law and under the BIA's, principles of due process prevent us from holding Petitioner to its evidentiary standard. *Cf. Singh v. INS*, 213 F.3d 1050, 2000 WL 675138, at *4 (9th Cir. May 25, 2000) ("[H]ad Singh been notified of the newly announced evidentiary requirements, he may very well have been able to secure the necessary affidavits or declarations."). Accordingly, due process principles require that Petitioner be given a second opportunity to prove his eligibility for asylum to an IJ, along with an opportunity to call his father as a witness who can potentially corroborate the facts alleged in Petitioner's application.

### VI.

For the foregoing reasons, the petition for review is GRANTED. We remand to the BIA with instructions that it remand for further proceedings consistent with this opinion.