# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SATPAL SINGH CHAWLA; JASBIR
KAUR; INDERPREET SINGH CHAWLA,
              *Petitioners,*

v.

ERIC H. HOLDER Jr., Attorney
General,
              *Respondent.*

No. 05-74823

Agency Nos.
A077-427-104
A077-427-105
A077-427-108

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 9, 2010—San Francisco, California

Filed March 26, 2010

Before: Diarmuid F. O'Scannlain, Stephen S. Trott and
Richard A. Paez, Circuit Judges.

Opinion by Judge Trott

## COUNSEL

Christopher Stender, San Francisco, California, for the petitioner. Martin Avila Robles, San Francisco, California, was on the briefs.

William Munick, U.S. Department of Justice, Washington, D.C., for the respondent. Marion E. Guyton, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., was on the brief.

## OPINION

TROTT, Circuit Judge:

Satpal Singh Chawla ("Chawla"), his wife Jasbir Kaur, and his son Inderpreet Singh Chawla (collectively "Petitioners") petition for review of the Board of Immigration Appeals' ("BIA") decision affirming an immigration judge's ("IJ's") denial of Chawla's applications for asylum, withholding of removal, and Convention Against Torture ("CAT") relief. The BIA's decision was based on an adverse credibility finding. We grant the petition for review and remand for further proceedings consistent with this opinion.[1]

## I. BACKGROUND

Petitioners are a Sikh family from Delhi, India. Chawla, who was the president of a local Young Sikh Association in India, claims he was persecuted by the Indian police on two occasions. According to Chawla, the first incident of persecution occurred on March 15, 1998, when he was arrested by Indian police at a rally attended by Sikhs protesting the implementation of a new helmet law. The helmet law required all Sikhs to wear helmets while driving or riding on two-wheeled vehicles unless they were wearing a turban. The Sikhs were protesting the law because wearing helmets is against the Sikh religion.[2] Chawla testified that while he was making a speech,

---

[1]In *Chawla v. Holder*, No. 05-77410, Petitioners petition for review of the BIA's denial of their motion to reopen. We address that petition in a separate memorandum disposition filed concurrently with this opinion.

[2]Evidence in the record explains that Sikh scriptures provide clear guidelines that "cursed is the Sikh who wears headgear," and that by forcing Sikh women to wear helmets, the Indian government is "prohibiting [Sikhs] from practicing [their] religion."

rally participants began shouting anti-government slogans and the police began beating them with sticks. The police then arrested Chawla and detained him for seven days, during which time they kicked him, slapped him, beat him with sticks, tied him to a cart, pushed a stick into his mouth, and told him "now make a speech now against us. . . . Sikh's [sic] like you we are going to wipe them out." Chawla was released after his father paid the police a bribe of 10,000 rupees.

The second incident of alleged persecution began on May 15, 1998, when Chawla was arrested following an explosion on the bus he was driving. Chawla testified he was driving the bus when a gas cylinder, which belonged to a passenger who sold balloons, exploded on the bus. The police stopped to investigate the explosion, arrested Chawla, and detained him for ten days. Chawla testified that during his detention, the police beat him, broke his right wrist, and accused him of having links with terrorists and deliberately causing the explosion. Chawla was released after his father and two others paid the police a bribe of 50,000 rupees.

Chawla testified that after he was released, he went to Patiala, Pajabi, and stayed at his brother-in-law's house. He stayed there for only a few weeks, however, because his relatives asked him to leave after the police came looking for him at the house. Chawla testified that he then returned to Delhi and stayed in a Sikh temple for a few days, during which time his wife came to see him and told him that, on three or four occasions during the previous month, the police came to the family home looking for him. Chawla then moved to his father-in-law's house, where he stayed until he, his wife, and his child left India.

Petitioners entered the United States on non-immigrant visas. Prior to the expiration of his visa, Chawla applied for asylum, withholding of removal, and CAT relief. Chawla's wife and son are beneficiaries of the asylum application.

After three merits hearings, the IJ found Chawla not credible and denied all forms of relief. The IJ further found that even if Chawla was credible, he had not established that he will suffer future persecution on account of a protected ground.

The BIA dismissed Petitioners' appeal of the IJ's decision. The BIA, citing *In re Burbano*, 20 I. & N. Dec. 872 (BIA 1994), adopted and affirmed the IJ's adverse credibility finding and thereby affirmed the IJ's denial of Chawla's application for asylum, withholding of removal, and CAT relief. However, the BIA did not adopt or affirm the portion of the IJ's decision finding that even if Chawla were credible, he failed to meet his burden for relief.

## II. STANDARDS OF REVIEW

Where the BIA conducts its own review of the evidence and law, appellate review "is limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted." *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006) (internal quotation marks and citation omitted).

Adverse credibility findings are reviewed under the substantial evidence standard and "will be upheld unless the evidence compels a contrary result." *Don v. Gonzales*, 476 F.3d 738, 741 (9th Cir. 2007) (emphasis omitted). The agency must articulate a legitimate basis to question the petitioner's credibility and must offer specific and cogent reasons for any stated disbelief. *Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002) (citation omitted). The articulated reasons "must be substantial and bear a legitimate nexus to the finding." *Id.* (internal quotation marks and citation omitted). "[W]hen each of the IJ's or BIA's proffered reasons for an adverse credibility finding fails, we must accept a petitioner's testimony as credible." *Kaur v. Ashcroft*, 379 F.3d 876, 890 (9th Cir. 2004).

## III.   DISCUSSION

Our review is limited to the BIA's decision and the portion of the IJ's decision concerning the adverse credibility finding. We do not review the portion of the IJ's decision that found that Chawla failed to meet his burden of proof for relief even if he were credible because the BIA did not expressly adopt or affirm that holding. *See Hosseini*, 471 F.3d at 957.

The IJ articulated six reasons for finding Chawla not credible, and the BIA independently articulated a seventh reason. None of the reasons articulated by the IJ or BIA, considered either separately or in combination, provide a legitimate basis to question Chawla's credibility. Therefore, we hold that the adverse credibility finding is not supported by substantial evidence.

### A.   Submission of Differing Newspaper Articles

At the first merits hearing, Chawla testified that, at the March 15, 1998 rally, Indian police beat protestors with sticks and arrested several protestors, including Chawla. Chawla also submitted Exhibit 4G, a newspaper article about the March 15, 1998 rally. The article is from "Current News Today," a newspaper distributed throughout Delhi, India. The article specifically names Chawla and notes that he gave a speech at the rally, but it does not indicate that any arrests or violence occurred. The last lines of the article reads: "[T]he police headquarters and senior officers have guaranteed . . . that this law will not be enforced, that they will not issue tickets. . . . After that the demonstration was ended."[3]

---

[3]Two different translators offered two different translations of Exhibit 4G. The translator present at the hearing provided the translation quoted above. Prior to the hearing, another translator provided a written translation of Exhibit 4G. According to the second translator, the final sentence of Exhibit 4G reads: "The senior officers of police assured the Sikhs to consider this matter sympathetically and the protest was finished after this." The minor differences in these translations are immaterial to our analysis.

The IJ asked Chawla if Exhibit 4G was the only news report of the rally in question and if there were any news reports indicating that protestors were arrested. Chawla replied that he had read some news articles that reported the arrests, but that he did not currently have any of those articles in his possession. Chawla explained that he originally submitted Exhibit 4G to an asylum officer because the asylum officer had asked him for supporting documentation, and Exhibit 4G is what he obtained through his father. When the IJ asked Chawla why Exhibit 4G did not indicate that anyone at the rally had been arrested, Chawla replied, "Maybe it's not written there, I don't know. There are some people who are against the Sikh's [sic]." When asked on cross-examination why Exhibit 4G indicates that the protestors "had a peaceful meeting with the police officials," Chawla replied, "[E]ven the press is prone to lying about issues. What can I say about this?" When asked why he would submit Exhibit 4G, an "inaccurate" article, in support of his case, Chawla replied, "This was to prove basically the fact that the rally did in fact take place and so I was asked to furnish some kind of documentation that affected and this was not given to the court, this was submitted to the INS office."

At the end of the first merits hearing, the IJ again asked Chawla if Chawla had any reports that might confirm his version of what happened. Chawla replied that he did not have any reports at the present time, but that he would ask his father.

At the second merits hearing, Chawla submitted Exhibit 13, a newspaper article from the "Evening Punjabi Samachar," which is a newspaper distributed in an area inhabited by a large number of Sikhs. The last lines of Exhibit 13 read,

> When Satpal Singh Chawla, president of Young Sikh Association was speaking, some Sikhs raised anti police and anti government slogans. Some of them started pro Khalistan slogans. On this the police

force started mercilessly beating the Sikhs. In the rally, many Sikh men, women and children were injured. Satpal Singh Chawla and few other Sikhs arrested.

Although the IJ agreed with the government attorney that Exhibit 13 was "highly suspicious," the IJ did not question the authenticity of Exhibit 13 in his decision.

The IJ questioned Chawla's credibility based on Chawla's submission of Exhibits 4G and 13 because Chawla "never satisfactorily explained, if he did not agree with Exhibit 4G, why he presented it in the first place." The BIA characterized this as a "compelling aspect" of the IJ's decision and concluded that Chawla "should have contemporaneously clarified the article's inaccuracy."

[1] Chawla's submission of Exhibits 4G and 13 does not support the adverse credibility finding. First, we note that Exhibits 4G and 13 are not wholly inconsistent. Exhibit 4G simply states that the March 15, 1998 rally ended after the police assured the Sikh protestors that no tickets would be issued for violations of the helmet law, and although Exhibit 4G fails to report that any violence or arrests did in fact occur, it also does not state that violence or arrests did not occur.

[2] Second, Chawla provided reasonable explanations for the different accounts of the rally in Exhibits 4G and 13, and he reasonably explained why he submitted Exhibit 4G in support of his case. Chawla explained that the newspaper articles likely differ because Exhibit 4G is from a newspaper distributed throughout Delhi, whereas Exhibit 13 is from a newspaper distributed in an area with a large Sikh population. Chawla also explained that Exhibit 4G may be inaccurate because "the press is prone to lying about issues." Further, Chawla explained that he submitted Exhibit 4G because the INS office asked him for documents supporting his claim for

asylum, and when he submitted the article, his focus was on proving that the March 15, 1998, rally occurred.

**[3]** Third, neither the IJ nor the BIA specifically addressed Chawla's explanation for the different accounts of the rally contained in the articles or his explanation as to why he submitted Exhibit 4G. *See Kaur*, 379 F.3d at 887 ("An adverse credibility finding is improper when an IJ fails to address a petitioner's explanation for a discrepancy or inconsistency.").

**[4]** Finally, Chawla's submission of Exhibit 4G, without providing a contemporaneous clarification that the article was not entirely accurate, does not support the adverse credibility finding because, again, Exhibit 4G is not wholly inconsistent with Chawla's testimony or Exhibit 13. Thus, requiring Chawla to clarify Exhibit 4G's "inaccuracy" upon submission of that exhibit to the immigration court would have required that Chawla be omniscient; Chawla would have had to have known that the IJ would find Exhibit 4G as different as "night and day" from Exhibit 13. An asylum applicant cannot be expected to sua sponte "clarify," upon submission to the immigration court, evidence that is not wholly inconsistent with the applicant's testimony or other documentary evidence.

**[5]** For the above reasons, we conclude that Chawla's submission of Exhibits 4G and 13, and his failure to clarify upon submission that Exhibit 4G was not entirely accurate, do not support the adverse credibility finding.

## B. Failure to Explain Sentence in Newspaper Article Submitted by the Government

At Chawla's second merits hearing, the government introduced Exhibit 17 into evidence. Exhibit 17 is a compilation of various newspaper articles, some of which discuss the Indian helmet law. One of those articles is dated January 5, 1998, and one sentence in that article reads, "Accused of interfering with religious freedom, the Delhi Police hastily

exempted sardarnis (Sikh women) from a new law requiring helmets for pillion riders on two-wheelers." Another article in Exhibit 17 contains a copy of the helmet law, which reads, in part, "provided further that the State Government [may] provide for such exceptions [to the helmet law] as it may think fit."

Chawla was asked why Exhibit 17 states that Sikh women had been exempted from the helmet law as of January 5, 1998, a date that preceded the March 15, 1998 rally. In response, Chawla testified, "I don't know why this article says what it says," and "It's solely published but its not true, it's a lie." The BIA, adding to the reasons articulated by the IJ for the adverse credibility finding, questioned Chawla's credibility based on Chawla's failure to explain the above-quoted sentence from the newspaper article in Exhibit 17.

**[6]** Chawla's failure to explain the sentence in the newspaper article does not support the adverse credibility finding. First, we question the reliability of the newspaper article's sentence at issue because the sentence says that the Delhi *police* exempted Sikh women from the helmet law. However, according to the helmet law as reproduced in Exhibit 17, only state *governments* can craft exceptions to the helmet law, not state *police*. Both the IJ and the BIA failed to note this internal contradiction contained in Exhibit 17.

Additionally, Exhibit 6, a newspaper article from "The Hindustan Times," introduced into evidence by Chawla, appears to contradict the sentence at issue in Exhibit 17, a fact that the IJ and BIA also failed to note. Specifically, Exhibit 6 states that Sikh women were protesting the helmet law on July 25, 1998, by refusing to wear helmets. However, if, as the sentence at issue in Exhibit 17 states, Sikh women had indeed been exempted from the helmet law as of January 5, 1998, there would have been no reason for the Sikh women to protest that law more than six months later, in July 1998.

For the above reasons, we conclude that Chawla's inability to explain the single, contradicted sentence in Exhibit 17 does not support the adverse credibility finding.

## C.  Failure to Provide Corroborating Evidence Regarding Suspension from Employment, and "Inconsistent" Evidence Regarding End of Employment

At the first merits hearing, Chawla testified that on March 27, 1998, he was suspended from his job at the Hotel Kanishka because his employer considered the seven days during which he was detained after the March 15, 1998, rally to be leave without permission. Chawla testified that he was given a written letter of suspension, and the IJ stated that he would like to see that letter. Chawla informed the IJ that he did not have the letter with him, but that he would check his files or ask his father "if it [was] still available." Chawla then testified that he had never been formally terminated from his job at the Hotel Kanishka because "[t]hat takes time for the inquiries and everything, I came here in August."

At the second merits hearing, Chawla submitted Exhibit 12, which is titled, "Termination Order," and is dated June 7, 1999. The Termination Order is from the Hotel Kanishka and reads, in part,

> This is in reference to the Show Cause Notice referred to above sent to you . . . in respect of the charges contained in the charge sheet . . . dated 27.10.1998. . . . Since the charges levelled [sic] and proved against you in the enquiry are grave and serious in nature, you are hereby awarded the punishment of TERMINATION OF SERVICES with immediate effect.

The IJ asked Chawla where the suspension letter was, and Chawla replied, "It's in De[lh]i in India. I didn't know that I

have to bring so many papers, bring them across with me." Chawla informed the IJ that he had not been aware of the Termination Order until his father sent it to him after he asked his father to send documents regarding the end of his employment at the Hotel Kanishka.

At the third merits hearing, Chawla testified that his father could not find the original suspension letter and that his father tried to get a copy of the suspension letter but was unable to do so because all of the hotels under the India Tourism Development Corporation ("ITDC"), including the Hotel Kanishka, had been closed.

The IJ questioned Chawla's credibility, concluding that the Termination Order did not relate to the suspension letter. The IJ reasoned that, because the Termination Order indicated that the charges leveled against Chawla were "grave and serious" in nature, the Termination Order must relate "to some other charges far more serious than leave without permission."

**[7]** The IJ's conclusion that the charges referred to in the Termination Order must be "far more serious than leave without permission" was based on speculation and conjecture. Chawla testified that, to his knowledge, no formal criminal or civil charges had ever been filed against him in India, and there is no evidence demonstrating that Chawla was ever accused or convicted of any crime or civil charge more serious than being absent from work without permission. Although the Termination Order refers to charges that are "grave and serious in nature," it provides no further explanation or hint as to what those charges could be. Any speculation as to what charges the Termination Order refers to is just that—pure speculation. Such speculation cannot be used to support the adverse credibility finding. *See Shah v. INS*, 220 F.3d 1062, 1071 (9th Cir. 2000) ("We cannot uphold an adverse credibility finding that rests on conjecture and speculation." (citation omitted)).

The IJ also did not believe Chawla's testimony that his father was unable to obtain the charge sheet referred to in the Termination Order because all the hotels operated under the ITDC were closed. The IJ stated that "[t]his court does not accept that testimony as credible, but will demand corroboration that such is the case."

An IJ can demand corroborating evidence when he "has reason to question the applicant's credibility," and when the evidence requested is "non-duplicative, material, [and] easily available." *Sidhu v. INS*, 220 F.3d 1085, 1092 (9th Cir. 2000); *see also Guo v. Ashcroft*, 361 F.3d 1194, 1200-01 (9th Cir. 2004) (holding that corroborative evidence of job termination was not "easily available" because the certificate of dismissal was in China). Here, however, the charge sheet was not easily available to Chawla because it was in India and under the control of a third party, the ITDC. Further, because the charge sheet was not easily available, Chawla's failure to provide that corroborating evidence does not support the adverse credibility finding. *See Sidhu*, 220 F.3d at 1092; *Guo*, 361 F.3d at 1201.

Adding to the IJ's reasoning, the BIA articulated four additional reasons for finding Chawla not credible based on the above evidence. First, the BIA found that the Termination Order did "not comport with [Chawla's] earlier testimony regarding the suspension," and that Chawla "specifically stated that he was not terminated from his employment." We disagree with the BIA because our review of the evidence demonstrates no inconsistency between Chawla's testimony and the Termination Order. Specifically, Chawla's testimony that he had never formally been terminated from the Hotel Kanishka took place at his first merits hearing, *before* Chawla was informed by his father that a formal Termination Order had arrived at his father's house in India. At the second merits hearing, Chawla explained, "I didn't even know that letter had arrived. . . . [My father] said there was a termination order or letter of that effect and I asked him to send it to me conse-

quently." That Chawla was unaware of the existence of the Termination Order at the first merits hearing is further supported by the fact that Chawla arrived in the United States on August 11, 1998, nearly ten months before the Termination Order was issued on June 7, 1999.

Second, the BIA concluded that the Termination Order was "poorly drafted and formatted," which undermined its reliability. Again, we disagree. Looking at the Termination Order, we fail to see how the BIA concluded that it was "poorly drafted and formatted," and the BIA offered no specific or cogent reason supporting its conclusion. Moreover, even if the Termination Order were "poorly drafted and formatted," such a conclusion does not bear a substantial and legitimate nexus to the adverse credibility finding. To the contrary, if the Termination Order was not reliable, then the nexus relied on by the IJ—that the charges in the Termination Order relate "to some other charges far more serious than leave without permission"—would be further undermined. Thus, the BIA's conclusion that the Termination Order was "poorly drafted and formatted" does not support the adverse credibility finding. *See Gui*, 280 F.3d at 1225 ("The IJ must have a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief. Any such reason must be substantial and bear a legitimate nexus to the finding." (internal quotation marks and citations omitted)).

Third, the BIA questioned "why [Chawla] chose not to challenge his suspension in light of the fact that he acknowledged it was basically due to a personal dispute with his manager, that he had been employed by the company since 1977, and was the General Secretary of the union." The BIA's disbelief of Chawla's decision not to challenge his suspension from work was based on speculation and conjecture about what someone in Chawla's position would or would not do; thus, it does not support the adverse credibility finding. *See Shah*, 220 F.3d at 1071 ("We cannot uphold an adverse credi-

bility finding that rests on conjecture and speculation." (citation omitted)); *see also Zhou v. Gonzales*, 437 F.3d 860, 865 (9th Cir. 2006) (holding that an IJ's disbelief of an applicant's testimony did not support an adverse credibility finding because the IJ's disbelief was "based on speculation and conjecture about Zhou's position in Chinese society and what someone in that position would or would not do").

Fourth, the BIA found that Chawla's "account also conflicts with an affidavit submitted by his neighbor in India, that states that [Chawla] quit his job." Again, we disagree because, contrary to the BIA's assertion, the neighbor's affidavit is not inconsistent with Chawla's testimony.[4] The neighbor's affidavit begins by stating that Chawla "was forced to leave his job," which is consistent with Chawla's testimony that he was suspended from work. The later statement in the affidavit that Chawla "quit" his job was made in reference to the fact that, in order to keep his job, Chawla would have to compromise his religion by cutting his hair and beard, and Chawla was not willing to do so. This statement in the affidavit is consistent with Chawla's testimony that the general manager of the Hotel Kanishka told Chawla that he would give Chawla his job back if Chawla cut his hair and trimmed his beard, but that Chawla was not willing to do so.

[8] Finally, we note that Chawla did not claim that being suspended or terminated from his employment at the Hotel Kanishka was an act of persecution. Thus, even if there were a minor inconsistency between Chawla's testimony and the

---

[4]The affidavit states, in relevant part,

> Satpal Singh's trouble was further compounded because he was forced to leave his job at a prestigious Delhi Hotel. Satpal Singh told me that his boss was prejudiced against Sikhs and wanted him to cut his hair and shave his beard in order to continue working at the hotel. The growing of a beard and long hair is a requirement of Sikhism and Satpal Singh told me that he was not willing to compromise his religion for the sake of his job so he quit the hotel.

exhibits he submitted, such an inconsistency would not go to the heart of Chawla's claims of persecution and, thus, would not support the adverse credibility finding. *See Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 660 (9th Cir. 2003) ("Minor inconsistencies in the record that do not relate to the basis of an applicant's alleged fear of persecution, go to the heart of the asylum claim, or reveal anything about an asylum applicant's fear for his safety are insufficient to support an adverse credibility finding." (citation omitted)).

## D. Failure to Provide "Strong" Corroborating Evidence of Bus Explosion and Subsequent Arrest and Mistreatment

Chawla testified that following the May 15, 1998, explosion on the bus he was driving, the police arrested him, detained him, beat him, and broke his right wrist. Chawla went to a chiropractor in the United States who told him that "all of the bones [in his right wrist] are jammed, not fixed properly." Chawla testified that no media reports related to the bus explosion exist and, therefore, he was unable to locate any such reports. He explained to the IJ, "It was a minor incident, these kind[s] of minor accidents go unreported, they are too small." When the IJ questioned Chawla about characterizing the incident as "minor," Chawla replied, "They knew it was not a bomb. The police got to it, it was not a bomb." Chawla testified that the police did not issue an accident report, but that the police did take written notes from witness interviews. Later during the hearing, the IJ stated, "you see the police might have thought it was a bomb which is all the more reason why I would have expected there to have been a report of what happened and an investigation to find out why it happened." Chawla reiterated his earlier testimony that the police did investigate, but that there was no report. At the end of Chawla's second merits hearing, the IJ acknowledged that Chawla is "absolutely convinced there is [no accident report] so I won't pursue that. I can't imagine it but stranger things have happened. I'm not disputing it."

Additionally, Chawla testified that he did not file an insurance claim or report for the damage done to the bus by the explosion because he was able to fix the damage—which consisted of broken windows—himself and making an insurance claim is an extremely lengthy procedure that wastes a lot of time.

Finally, Chawla submitted a letter from Professional Chiropractic Care, located in Sacramento, California; notes from an Indian doctor; and notes from an Indian hospital. The letter from Professional Chiropractic Care, dated March 6, 2000, states, in relevant part: "Mr. Satpal Chawla . . . . has right wrist pain from injury in India approximately May 1998. The injury left him with two fractured bones in the wrist." The Indian doctor's notes, dated May 25, 1998, contain Chawla's name at the top and refer to a right wrist. The Indian hospital notes, also dated May 25, 1998, contain Chawla's name at the top and refer to an x-ray for a right wrist.

In finding Chawla not credible, the IJ acknowledged that Chawla provided evidence that he suffered a fractured wrist, but then noted, "but the question persists as to the circumstances under which [Chawla] might have sustained the injury, since that is not confirmed in terms of the medical record." Similarly, the BIA questioned Chawla's credibility in regard to the bus explosion because Chawla "did not provide any strong corroborating evidence to verify that it occurred and resulted in his arrest and mistreatment."

[9] The IJ's and BIA's conclusion that media or police reports of the explosion exist was based on impermissible speculation and conjecture. Chawla repeatedly testified that no such reports exist, or, if they did, that he was unable to locate such reports, and neither the IJ nor the BIA point to any evidence in the record that indicates that such reports do exist. Accordingly, Chawla's failure to provide corroborating media or police reports does not support the adverse credibility finding. *See Shah*, 220 F.3d at 1071 ("We cannot uphold an

adverse credibility finding that rests on conjecture and speculation." (citation omitted)).

Moreover, to the extent the IJ and BIA faulted Chawla for not providing a corroborating police report, we find that such a report, if it does exist, would not be easily available to Chawla because obtaining such a report would require Chawla's persecutors to comply with his request for evidence. Accordingly, Chawla's failure to provide a corroborating police report does not support the adverse credibility finding. *See Sidhu*, 220 F.3d at 1092 (holding that an IJ can, in certain circumstances, demand corroborating evidence when that evidence is "non-duplicative, material, [and] easily available").

**[10]** Finally, we hold that the BIA improperly questioned Chawla's credibility based on Chawla's failure to provide "strong" corroborating evidence of the bus explosion and his subsequent arrest and mistreatment. Likewise, the IJ improperly required Chawla to submit medical records that *conclusively* establish that Chawla's injury resulted from police mistreatment. When appropriate, our case law provides that an IJ or the BIA can require corroborating evidence. However, our case law does not require that such evidence be "strong" or "conclusive." *See, e.g.*, *id.*

## E. "Implausible" Explanation of How Chawla Received Visa to Enter the United States

Chawla testified that he and his family physically went to the U.S. Consulate in New Delhi in order to obtain visas to enter the United States. When asked what he told the officer as a basis for his visa to the United States, Chawla testified, "Just to visit." Chawla further testified that, at the time the visas were issued, he did not have intentions of permanently residing in the United States. The IJ then asked Chawla, "What were you thinking?" and Chawla replied, "I was very afraid at that time. The only intention was to get away from there. . . . I thought maybe if I'm able to come here I might

be able to save myself." Chawla then reiterated that he did not come to the United States with the intention of seeking asylum, and that he "thought that when the conditions improve in India, [he] would return back."

The IJ characterized Chawla's testimony as follows:

> During the [hearing, Chawla] was questioned with regard to the circumstances under which he applied for and received the visas and he indicated that he wished to visit the United States to "save himself" and that he would return to India when "conditions changed." This Court finds any such conversation with the United States Consulate at the Embassy in New De[lh]i inherently unworthy of belief if it resulted in the issuance of a non-immigrant visitors visa.

**[11]** The IJ's characterization of Chawla's testimony is inaccurate. Specifically, Chawla did not testify that he received a visa as a result of telling the officer at the U.S. Consulate that he wished to visit the United States in order to "save himself." To the contrary, Chawla testified that he told the officer that he wanted a visa so that he could "visit" the United States. Chawla's testimony regarding "saving himself" was in response to the IJ's question of what Chawla was *thinking* at the time; there is no evidence that Chawla shared that thought aloud with the officer.

**[12]** Because the IJ's skepticism as to the plausibility of Chawla's testimony was based on a mischaracterization of that testimony, such skepticism did not provide a proper basis for upholding the adverse credibility finding. *See Singh v. Gonzales*, 439 F.3d 1100, 1110 (9th Cir. 2006) ("The IJ's skepticism as to the plausibility of [an applicant's] account may be a proper basis for finding his testimony is inherently unbelievable, if [the IJ's] logical inferences are supported by substantial evidence." (citation omitted)).

**F. Background Information Regarding Current Treatment of Sikhs in New Delhi**

At the final merits hearing, the government submitted the "U.S. Department of State Country Reports on Human Rights Practices — 2003" for India ("2003 Country Conditions Report"). This report was the last exhibit admitted into evidence that provided statistics about the Sikh population in India.

While discussing the grounds on which he was basing the adverse credibility finding, the IJ stated,

> In terms of the latest statistics, there is a sizeable Sikh community currently residing outside of the Punjab and in particular, in New De[lh]i. There is nothing in this background information that suggests that the Sikh community in New De[lh]i is suffering persecution at this particular time on account of any one or more of the five factors for consideration.

**[13]** The IJ and BIA erred to the extent they based the adverse credibility finding on the statistics contained in the 2003 Country Conditions Report because those statistics reveal nothing about the circumstances or persecution of Sikhs living in New Delhi in 1998, the year in which Chawla claims he was persecuted. *Gui*, 280 F.3d at 1225 (holding that a reason supporting an adverse credibility finding "must . . . bear a legitimate nexus to the finding" (internal quotation marks and citation omitted)).

**G. Testimony that the Indian Police are Still Interested in Chawla**

Chawla testified that his father told him on several occasions that the Indian police had come looking for Chawla since he departed for the United States. Chawla also submit-

ted Exhibit 19, an affidavit from his father, which reads, in relevant part,

> [D]uring the previous days I have been threatened by the Local Police, who always forced me to call you son/children from USA. [O]n [February 23, 2004,] the local police also threate[ne]d . . . me and also harrassed [sic] me for calling my children from USA which is not easy presently, and when I argued with them they pressurised [sic] me very badly.

The IJ concluded that, unless there were facts that Chawla withheld from the court as to precisely what his situation was in India when he left, it was "inherently unworthy of belief" that the local police would still be interested in Chawla after almost six years simply because Chawla was communicating with his father by phone from the United States.

**[14]** The IJ's disbelief of Chawla's testimony and his father's affidavit was based on speculation and conjecture about the circumstances under which the local Indian police would remain interested in Chawla, and that Chawla may be withholding facts from the court. Such "conjecture and speculation cannot serve as a reason for an adverse credibility finding." *Shah*, 220 F.3d at 1071 (citation omitted).

## IV. CONCLUSION

**[15]** Because each of the IJ's and BIA's proffered reasons for the adverse credibility finding fail, we accept Chawla's testimony as credible. *See Kaur*, 379 F.3d at 890. This determination, however, is not the end of the matter, because the BIA did not address (1) whether Chawla's treatment in India amounted to persecution, (2) whether his treatment was on account of one of the grounds protected by our asylum law, and (3) whether he has a well-founded fear of persecution should he be returned. *See Melkonian v. Ashcroft*, 320 F.3d 1061, 1064 (9th Cir. 2003) (citing 8 U.S.C. § 1101(a)

(42)(A)). Thus, we remand to the BIA for further proceedings, including a determination of his eligibility for withholding of removal or CAT relief.

Petition GRANTED.